Martin G. Bunin
Craig E. Freeman
Catherine R. Fenoglio
Alston & Bird LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400

*Counsel for the Official Committee of*
*Unsecured Creditors of Cabrini Medical Center*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------x
In re:                            :    Chapter 11
                                  :
CABRINI MEDICAL CENTER,           :    Case No. 09-14398 (AJG)
                                  :
                    Debtor.       :
-------------------------------------------------x
OFFICIAL COMMITTEE OF             :
UNSECURED CREDITORS OF            :
CABRINI MEDICAL CENTER,           :
                                  :
                    Plaintiff,    :    Adv. Pro. No. _____
                                  :
        - against –               :
                                  :
MISSIONARY SISTERS OF THE         :
SACRED HEART, ILLINOIS and        :
MISSIONARY SISTERS OF THE         :
SACRED HEART, NEW YORK,           :
                                  :
                    Defendants.   :
-------------------------------------------------X
```

## ADVERSARY COMPLAINT

The Official Committee of Unsecured Creditors (the "Committee") appointed in

this bankruptcy case, by and through its undersigned counsel, hereby brings this

adversary proceeding against Missionary Sisters of the Sacred Heart, Illinois ("MSSH-

ILL") and Missionary Sisters of the Sacred Heart, New York ("MSSH-NY" and, together

with MSSH-ILL, the "<u>Defendants</u>"), alleged creditors of Cabrini Medical Center ("<u>CMC</u>" or the "<u>Debtor</u>").

## JURISDICTION AND VENUE

1.        This adversary proceeding arises under the Bankruptcy Code and arises in and is related to the above-captioned chapter 11 case pending before this Court.

2.        This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

3.        This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (F), (H), (K) and (O).  This adversary proceeding is commenced under Rule 7001(1), (2), (7), (8) and (9) of the Federal Rules of Bankruptcy Procedure.

4.        Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C. § 1409(a).

## STANDING TO FILE THIS COMPLAINT

5.        Pursuant to the Interim Order (I) Authorizing Debtor to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 364(c) and 364(d); (II) Authorizing the Use of Cash Collateral Pursuant to 11 U.S.C. § 363; (III) Granting Liens and Super-Priority Claims; (IV) Granting Adequate Protection to the Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; and (V) Scheduling a Final Hearing, dated July 30, 2009, the Committee has been granted standing and authority to file on behalf of the Debtor's estate the causes of action against the Defendants alleged in this complaint.

## PARTIES

6.        Prior to filing for bankruptcy protection, CMC was a not-for-profit healthcare provider in New York, New York.  CMC filed for protection under chapter 11

of title 11 of the United States Code (the "Bankruptcy Code") on July 9, 2009 (the "Petition Date"). CMC continues in possession of its property and is operating and managing its business, as debtor in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7.      On July 20, 2009, the Office of the United States Trustee, pursuant to Section 1102 of the Bankruptcy Code, appointed the Committee. The Committee consists of the following members: (i) Consolidated Edison Company of New York (Committee Chair); (ii) A. Kingsbury Co., Inc., a/k/a Modern Medical Systems Co.; (iii) New York State Nurses Association; (iv) Owens & Minor; and (v) Shore Pharmaceutical Providers, Inc. On July 20, 2009, the Committee selected Alston & Bird LLP as its counsel.

8.      Upon information and belief, Defendant MSSH-ILL is an Illinois not-for-profit corporation with its principal address at 343 West Demins Place, 2nd Floor, Chicago, Illinois 60614.

9.      Upon information and belief, Defendant MSSH-NY is a New York not-for-profit corporation with its principal address at 219 East 19th Street, New York. New York 10003.

## FACTUAL ALLEGATIONS

A.      Historical Background

10.     Upon information and belief, the Debtor was founded in 1892 by Saint Frances Xavier Cabrini, the founder of the Defendants' religious order, and was originally known as Columbus Hospital.

11.     Upon information and belief, in the 1970's Columbus Hospital merged with a hospital known as the Italian Hospital and changed its name to Cabrini Medical Center.

12.     March 30, 1990, CMC and Stuyvesant Polyclinic executed, signed and verified a Certificate of Merger of Cabrini Medical Center and Stuyvesant Polyclinic into Cabrini Medical Center Under Section 904 of the Not-For-Profit Corporation Law, thereby merging all of Stuyvesant Polyclinic's assets and liabilities into CMC.

13.     Upon information and belief, Stuyvesant Polyclinic was a community health care center specializing in servicing the poor, which provided a full range of primary medical care, medical/surgical sub-specialty care, mental health and alcoholism treatment services ,AIDS services and a number of community outreach services.

14.     Upon information and belief, up until March 2008, the Debtor operated an acute care voluntary hospital at 227 East 19th Street, New York, New York 10003.

B.     Berger Commission

15.     The Commission on Health Care Facilities in the 21st Century (commonly referred to as the "Berger Commission") was created by Section 31 of Part E of Chapter 63 of the Laws of 2005 (the "Enabling Statute") to review the healthcare capacity and resources in New York State.

16.     The Berger Commission issued its report on November 26, 2006 and recommended that CMC "should close in an orderly fashion."

17.     On December 5, 2006, the Governor of the State of New York issued written approval of the Berger Commission's recommendations and a majority of the

members of each house of the New York State Legislature did not "vote to adopt a concurrent resolution rejecting the recommendations" by December 31, 2006.

18.     Thus, pursuant to the Enabling Statute, on January 1, 2007 the Berger Commission's recommendations became law and the State of New York Commissioner of Health was required to implement the Berger Commission's recommendations, including the closure of CMC.

19.     Upon information and belief, in early 2007 CMC received a letter dated January 31, 2007 from the State of New York Department of Health outlining the Department of Health's expected timeframe to implement the Berger Commission's recommendation, which included the revocation of CMC's operating certificate by the Commissioner of Health no later than June 30, 2008.

20.     Upon information and belief, in compliance with the Berger Commission's recommendations, in March 2008 CMC ceased operating as a hospital.

C.     The Defendants' Relationship with the Debtor

21.     Upon information and belief, CMC was incorporated by members of the Missionary Sisters of the Sacred Heart.

22.     Pursuant to the By-Laws of Cabrini Medical Center, one of the purposes of CMC is to "benefit, promote, support, by gift or otherwise, the qualifying religious, charitable and educational works operated by or in connection with the Missionary Sisters of the Sacred Heart. . ." and the "Members, Trustees and officers [of CMC] shall fulfill theses purposes in accord with the philosophy of the Missionary Sisters of the Sacred Heart as set forth in the Mission Standards and adopted and presented from time to time by the Members to the Trustees."

23.     The By-Laws further state that the Members of CMC consist of three classes (1) Class A – the individual who holds the office of Provincial of the Missionary Sisters of the Sacred Heart of Jesus, (2) Class B – those individuals who hold the office of Provincial Councilors of the Missionary Sisters of the Sacred Heart of Jesus and (3) Class C – certain individuals who are filling in for the Class A or B members, or have been appointed by the Class A and B members.

24.     The Powers for the Members as set forth in the By-Laws include, inter alia, powers to (a) elect all of the non-ex-officio Trustees of the Board and to remove any or all of the non-ex-officio Trustees, with or without cause, and (b) approve, upon action initiated and resolution adopted by the Board of Trustees, the granting of a security interest in or the encumbrances of any assets or property owned by CMC.

25.     Upon information and belief, a number of members of the Defendants' religious order worked at CMC in varying positions.

D.     The MSSH Transactions

26.     Upon information and belief, as a participant in the Medicare/Medicaid program CMC received reimbursements from Medicare/Medicaid starting in July of 1966.  Upon information and belief, pursuant to Medicare/Medicaid reimbursement policy CMC received reimbursements for various expenses including salaries of members of Defendants' religious order who worked at CMC (the "Salary Reimbursements").

27.     Upon information and belief, CMC attempted to disburse the Salary Reimbursements to the earmarked members of Defendants' religious order, but the monies were refused.  Upon information and belief, the Defendants instructed their

- 6 -

financial advisor, Robert Penn (deceased), to return the monies to CMC and label such monies as "loans" (the "Reimbursement Swaps").

28.     Upon information and belief, from 1966 through 1981, the Reimbursement Swaps were not evidenced by notes or any other written instrument. Upon information and belief, beginning in 1981 the Reimbursement Swaps were memorialized by promissory notes.

29.     Upon information and belief, CMC paid interest monthly on the Reimbursement Swaps at the prime rate of interest in effect at the time of payment to MSSH-NY.  Upon information and belief, MSSH-NY immediately upon receiving the "interest payment" advanced an identical sum to CMC and added the amount to the total amount owed under the Reimbursement Swaps.

30.     Upon information and belief, CMC sought reimbursement from Medicare/Medicaid for the amount of the "interest payment."

31.     As of December 31, 1982 (as set forth in more detail below), CMC was allegedly indebted to the Defendants in the total amount of $31,079,792, which, upon information and belief, included all amounts under the Reimbursement Swaps, the reloaning of the "interest payments" and all other monies received by CMC from the Defendants (the "1983 Amount").  Upon information and belief, the 1983 Amount was unsecured.

32.     Upon information and belief, as a result of a dispute regarding CMC's reimbursement of the "interest payments" from the Medicare/Medicaid program, CMC, MSSH-ILL, MSSH-NY, the State of New York Department of Health and Blue Cross and Blue Shield of Greater New York, both for itself and as Medicare Intermediary for

the Health Care Finance Administration, entered into a written agreement called the Release Agreement, dated November 9, 1983.

<u>The Substituted Notes for the 1983 Amount</u>

33.    Pursuant to the Release Agreement, the Defendants agreed to restructure the 1983 Amount.  Under the Release Agreement, the 1983 Amount was divided into two parts: (1) the Construction Loan portion, in the amount of $7,901,301 and (2) the Working Capital portion, in the amount of $23,178,491.

34.    The Construction Loan portion was evidenced by the 1983 Substituted Note, Series Two effective January 1, 1983 in the amount of $7,901,301 (the "<u>1983 Substituted Note, Series Two</u>").  1983 Substituted Note, Series Two was unsecured upon issuance.

35.    The 1983 Substituted Note, Series Two states that it is a demand note and that interest is to be paid monthly and calculated based upon the prime rate of interest as stated by the Chemical Bank.

36.    MSSH-ILL agreed in the Restated Loan Agreement effective January 1, 1983 (the "<u>Restated Loan Agreement</u>") and the 1983 Substituted Note, Series Two, that it would not exercise its right to demand payment before the earlier of (1) CMC having paid the mortgage loan evidenced by the Mortgage Note dated May 15, 1971 to the New York State Housing Financing Agency (the "<u>HFA</u>") or (2) the terms of the Subordination Agreement with HFA, Columbus Hospital (as predecessor of CMC) and MSSH-NY being modified to permit such payment of principal.

37.     Upon information and belief, the HFA Mortgage Note was paid in full by CMC.  Upon information and belief, the HFA Mortgage Note was not paid in full until 2005.

38.     Upon information and belief, as of the Petition Date the amount owed on the 1983 Substituted Note, Series Two is $13,072,781.51 (consisting of $7,901,301 in principal and $5,171,480.53 in unpaid interest).

39.     The Working Capital portion of the restructuring was evidenced by a 1983 Substituted Note, Series One effective January 1, 1983 in the amount of $23,178,491 (the "1983 Substituted Note, Series One").  1983 Substituted Note, Series One had a stated maturity date of December 31, 1985, was interest free and unsecured.

40.     The Restated Loan Agreement specifically states that "[CMC], MSSH-ILL and MSSH-NY agree that if [CMC] cannot pay the principal balance due on 1983 Substituted Note, Series One on December 31, 1985, MSSH-ILL will not resort to means of enforcement which will in any way be injurious to [CMC] but will consider appropriate extensions of the maturity of the 1983 Substituted Note, Series One."

41.     On April 17, 1985, CMC issued and delivered the 1985 Substituted Note, Series One in the principal amount of $19,651,575 (the "1985 Substituted Note") which extended the maturity date of the 1983 Substituted Note, Series One to December 31, 1987 and evidenced a reduction in principal.  The 1985 Substituted Note was unsecured upon issuance.

42.     Upon information and belief, on September 23, 1985 MSSH-ILL reduced the amount due under the 1985 Substituted Note by $2,934,261 in exchange for an

assignment from CMC of an indebtedness in the same amount owed to CMC by Stuyvesant Polyclinic.

43.     On January 1, 1987, CMC and the Defendants entered into the Agreement (the "Agreement") by which CMC transferred the real estate located at 444 Hope Chapel Road, Lakewood, New Jersey to MSSH-ILL in exchange for a reduction in the amount owed under the 1985 Substituted Note by $3 million and the issuance of the "1987 Substituted Note".

44.     The Agreement specifically states that "MSSH-ILL shall not, if [CMC] cannot pay the principal balance due on 1987 Substituted Note, Series One on December 31, 1990, resort to means of enforcement which will in any way be injurious to [CMC] but will consider appropriate extensions of the maturity of the 1983 Substituted Note, Series One."

45.     On January 1, 1987, CMC issued and delivered the 1987 Substituted Note, Series One which reflected the reduction in principal as set forth in the Agreement to $13,717,314 and extended the maturity date from December 31, 1987 to December 31, 1990.  The 1987 Substituted Note was unsecured upon issuance.

46.     Though the 1987 Substituted Note, Series One was not paid as required on December 31, 1990, no action appears to have been taken with regard to the expired 1987 Substituted Note, Series One until December 1994.

47.     On December 22, 1994 MSSH-ILL and Cabrini Development Council ("CDC") entered into the Property Exchanges and Loan Reduction Agreement whereby they agreed that the amount owed under the 1987 Substituted Note, Series One would be reduced by $900,000 and title to 216 East 19th Street would be transferred to CMC in

exchange for transfer of title of the real estate located at 215-217 East 21st Street, New York, New York to MSSH-ILL.

48.     On December 31, 1994, MSSH-ILL and CDC entered in the Modification Agreement by which they decreased the amount of the reduction of the 1987 Substituted Note, Series One from $900,000 to $100,000 based upon the satisfaction of a mortgage on the property located at 215-217 East 21st Street that was made by CDC to MSSH-NY.

49.     Upon information and belief, CDC is a fundraising organization for CMC and is completely controlled by the Defendants.

50.     Pursuant to the Second Restated Loan Agreement, effective December 31, 1994, between CMC and the Defendants, CMC issued and delivered the 1994 Substituted Note, Series One (the "1994 Substituted Note") in the principal amount of $13,617,313.

51.     The 1994 Substituted Note is a demand note and was unsecured upon issuance.

52.     Upon information and belief, there have been no additional reductions to the balance owed on the 1994 Substituted Note since December 31, 1994.

53.     Upon information and belief, the 1994 Substituted Note was never executed.

The Stuyvesant Polyclinic Mortgage Note

54.     Upon information and belief, on April 1, 1982 Stuyvesant Polyclinic entered into a Mortgage Note with MSSH-NY in the principal amount of $1,281,500, to be paid on April 1, 1986, and annual interest of 16.5% to be paid on the 1st of April, 1983 and annually thereafter (the "1982 Stuyvesant Mortgage Note").

- 11 -

55.     The 1982 Stuyvesant Mortgage Note was secured by a mortgage on 137 Second Avenue, New York, New York.

56.     Upon information and belief, on December 5, 1984 Stuyvesant Polyclinic entered into a Mortgage Note with MSSH-ILL for the same principal amount, to be paid on December 31, 1993, but at an annual interest rate of 8% , which replaced the 1982 Stuyvesant Mortgage Note (the "1984 Stuyvesant Mortgage Note").

57.     As of the Petition Date, the amount due under the 1984 Stuyvesant Mortgage Note is $3,409,123.33 (consisting of the original principal amount of $1,281,500 and accumulated interest of $2,127,623.33).

58.     Upon information and belief, the interest on the 1984 Stuyvesant Mortgage Note has not been paid since the late 1980's, as shown by the fact that there is over $2 million in interest, an amount that would take over 20 years to accumulate at the 8% annual interest rate on a non-compounding basis.

Assigned Stuyvesant Amounts

59.     On September 23, 1985, CMC assigned to MSSH-ILL all of its rights, title and interest in an indebtedness of $2,934,261 owed to CMC by Stuyvesant Polyclinic (the "Assigned Stuyvesant Claim") in exchange for an identical reduction in the principal amount owed under the 1985 Substituted Note.

60.     Upon information and belief, the Assigned Stuyvesant Claim was unsecured when it was assigned.

61.     Upon information and belief, the Assigned Stuyvesant Claim was not documented when it was assigned to MSSH-ILL by CMC.

62.    There is an unexecuted Secured Demand Note, dated May 18, 2005 and stated to be effective on July 27, 2005 which upon information and belief was an attempt to document the previously undocumented Assigned Stuyvesant Claim almost twenty years after its assignment as a secured debt, prior to its inclusion in the 2005 MSSH-ILL Mortgage (as defined below).

Allied Irish Bank Guarantee

63.    Upon information and belief, Allied Irish Bank, p.l.c., as Lender, and MSSH-ILL, as Guarantor, entered into that certain Commercial Guarantee dated September 29, 2000 pursuant to which MSSH-ILL guaranteed (the "Allied Irish Loan Guarantee") a borrowing of CDC from Lender in the principal amount of $3 million (the "Allied Irish Loan").

64.    Upon information and belief, CDC is a separate entity from CMC.

65.    Upon information and belief, the Allied Irish Loan proceeds were subsequently provided by CDC to CMC.

2004 Promissory Note

66.    On August 19, 2004, CMC and MSSH-NY entered into the Consolidated, Amended and Restated Promissory Note in the principal amount of $19.2 million and a fixed interest rate of 5.57% (the "2004 Promissory Note").

67.    The 2004 Promissory Note consolidated $13,121,919.94 owed pursuant to that certain Promissory Note, dated October 9, 2001 (referred to in the 2004 Promissory Note as the "prior indebtedness") and that certain Gap Note, dated August 19, 2004, in the amount of $6,078,080.06.

68.      Upon information and belief, MSSH-NY borrowed the $19.2 million from NorthMarq Capital and reloaned it to CMC.

69.      Upon information and belief, MSSH-NY is paying NorthMarq Capital a spread of 130 bps over the Ten Year Treasury Note for the $19.2 million.

70.      Upon information and belief, the "prior indebtedness" referred to in the 2004 Promissory Note is that certain Promissory Note dated October 9, 2001 between CMC and MSSH-NY in the amount of $13.5 million with an interest rate of 7.5% (the "2001 Promissory Note").

71.      The 2001 Promissory Note was permitted pursuant to the Re-Lending Agreement Between Cabrini Medical Center and Missionary Sisters of the Sacred Heart and the Promissory Note dated September 28, 2001 for the loan to MSSH-NY from Doral Money Inc. for $13.5 million (the "Doral Promissory Note").

72.      Upon information and belief, after the amounts lent to CMC in relation to the 2004 Promissory Note were used to pay certain debts, including the Doral Promissory Note, attorney's fees of the various parties, fees associated with various loans, Amalgamated Bank, NorthMarq Capital's costs and HFA (a creditor of CMC that had been superior to the Defendants), CMC only netted $531,940.51 from the $19.2 million dollar "loan".

73.      The 2004 Promissory Note calls for 360 payments each of $109,860.22.

74.      Upon information and belief, as of the Petition Date the current principal balance of the 2004 Promissory Note is $18,739,814 including $18,080,653 of unpaid principal and $659,161 in accrued but unpaid interest.

The 2005 Mortgages

75.　　On July 27, 2006, the Defendants and CMC entered into the Intercreditor Agreement whereby the Defendants agreed that they would only grant CMC's request for authority to enter into a secured loan agreement with Sun Life Assurance Company of Canada, with an address of One Sun Life Executive Park, Wellesley Hills, Massachusetts 02481-5699 ("Sun Life"), if CMC agreed to secure all of the Defendants "loans" with CMC.

76.　　The Intercreditor Agreement states that all of the "loans" between the Defendants and CMC were unsecured as of July 27, 2005.

77.　　CMC and Sun Life entered into that certain Mortgage and Security Agreement, dated July 29, 2005 in the amount of $36,000,000.00.[1]

78.　　CMC and MSSH-ILL entered into the Subordinate Mortgage and Security Agreement, dated July 27, 2005 (the "MSSH-ILL Mortgage") in the amount of $30,661,381 with an additional contingent amount of $3 million..

79.　　The MSSH-ILL Mortgage is subordinated to the mortgage of Sun Life.

80.　　The MSSH-ILL Mortgage purports to secure (1) the 1983 Substituted Note, Series Two, (2) the 1994 Substituted Note, (3) the 1984 Stuyvesant Mortgage Note, (4) the Assigned Stuyvesant Claim and (5) the Allied Irish Loan Guarantee.

---

[1]　The Committee is aware of that certain Substitute Mortgage A, dated as of August 8, 2008, given from CMC to Sun Life to secure debt of $21,500,000, which substituted for the Mortgage and Security Agreement, dated July 29, 2005 and that certain Consolidation, Modification and Restatement of Mortgages and Security Agreement, dated as of August 8, 2008, given by CMC to Sun Life to secure debt of $14,500,000. However, the two mortgages undertaken in 2008 are not relevant to the time period discussed in this complaint.

81.     CMC and MSSH-NY entered into the Subordinate Mortgage and Security Agreement, dated July 27, 2005 (the "MSSH-NY Mortgage") in the amount of $22,312,857.

82.     The MSSH-NY Mortgage is subordinated to the mortgage of Sun Life.

83.     Upon information and belief, the MSSH-NY Mortgage currently only secures the 2004 Promissory Note.

MSSH-NY Unsecured Claims

84.     CMC delivered to MSSH-NY a Promissory Note dated January 31, 2007 in the original principal amount of $1.2 million (the "2007 Promissory Note").

85.     The 2007 Promissory Note has a maturity date was May 1, 2008 and an interest rate of 7%.  Pursuant to the Promissory Note monthly interest was to be paid for February 2007 through June 2007, with monthly payments of $103,832.10 to be paid from June 2007 through April 2008.

86.     As of the Petition Date, the amount due under the 2007 Promissory Note was $1,319,000 consisting of $1.2 million of unpaid principal and $119,000 of accumulated and unpaid interest.

87.     CMC entered into the Amended and Restated Revolving Loan Note dated April 19, 2007 in the principal amount of $3 million, payable to MSSH-NY and issued pursuant to The Revolving Loan Agreement dated as of April 20, 2006 between CMC and MSSH-NY (the "MSSH-NY Revolving Note").

88.     The interest to be calculated at the "prime rate" was to be paid under the MSSH-NY Revolving Note on a monthly basis.

89.     As of the Petition Date the amount due under the MSSH-NY Revolving Note is $3,125,632 including $3 million of unpaid principal and $125,632 of accumulated and unpaid interest.

90.     Upon information and belief, MSSH-NY provided CMC with various amounts of cash infusions from December 2007 through July 2008 (the "Post-Berger Advances"; and combined with the 2007 Promissory Note, the MSSH-NY Revolving Note, and the "MSSH-NY Unsecured Scheduled Claim" (as defined below), the "MSSH-NY Unsecured Claims").

91.     Upon information and belief, none of the Post-Berger Advances have been documented.

E.      Scheduled Claims

92.     On August 24, 2009, CMC filed its "Schedules" in the above referenced bankruptcy proceeding.

93.     Pursuant to CMC's Schedule D – Creditors Holding Secured Claims, CMC schedules MSSH-ILL as having a $33,033,478.86 secured claim pursuant to the MSSH-ILL Mortgage.

94.     Pursuant to CMC's Schedule D – Creditors Holding Secured Claims, CMC schedules MSSH-NY as having an $18,739,814 secured claim pursuant to the MSSH-NY Mortgage.

95.     Pursuant to CMC's Schedule F – Creditors Holding Unsecured Nonpriority Claims, CMC schedules MSSH-ILL as having an unsecured claim in the amount of $3 million ("MSSH-ILL Unsecured Scheduled Claims").

LEGAL02/31581513v3

96.     Pursuant to CMC's Schedule F – Creditors Holding Unsecured Nonpriority Claims, CMC schedules MSSH-NY as having an unsecured claim in the amount of $6,385,979 ("MSSH-NY Unsecured Scheduled Claims", together with MSSH-ILL Unsecured Scheduled Claims, the "Unsecured Scheduled Claims").

F.     Avoidable Transfers

97.     On August 24, 2009, CMC filed its Statement of Financial Affairs in the above referenced bankruptcy proceeding.

98.     Included in CMC's Statement of Financial Affairs is a list of all checks and wire transfers paid to insiders the year prior to the petition date.

99.     On information and belief, based upon CMC's Financial Affairs, in the one year period prior to the Petition Date the Debtor made certain transfers by check, wire transfer or its equivalent, including transfers to or for the benefit of the Defendants in an aggregate amount not less than $1,315,798.15 (the "Avoidable Transfers"), as follows:.

| Check / Wire Transfer Number | Date | Transfer Amount |
|---|---|---|
| 248226 | 2/10/09 | $641.40 |
| 248284 | 2/17/09 | $641.40 |
| 248310 | 2/24/09 | $748.30 |
| 248408 | 3/03/09 | $641.40 |
| 248447 | 3/10/09 | $758.99 |
| 248492 | 3/17/09 | $641.40 |
| 248528 | 3/24/09 | $9,100.00 |
| 248529 | 3/24/09 | $609.33 |

| | | |
|---|---|---|
| 248566 | 3/31/09 | $555.88 |
| 248614 | 4/7/09 | $432.95 |
| 247014 | 7/31/08 | $11,000.00 |
| 247228 | 8/26/08 | $11,000.00 |
| 247507 | 10/06/08 | $11,000.00 |
| 247838 | 11/12/08 | $11,000.00 |
| 248057 | 12/23/08 | $8,468.17 |
| 248120 | 1/06/09 | $3,500.00 |
| 248166 | 1/27/09 | $13,605.46 |
| 248760 | 4/28/09 | $10,000.00 |
| 246979 | 7/29/08 | $109,860.22 |
| 247229 | 8/26/08 | $109,860.22 |
| 247508 | 10/06/08 | $109,860.22 |
| 247839 | 11/12/08 | $109,000.00 |
| 247876 | 11/17/08 | $860.22 |
| 248058 | 12/23/08 | $109,860.22 |
| 248167 | 1/27/09 | $109,860.22 |
| 248311 | 2/24/09 | $109,860.22 |
| 248530 | 3/2409 | $109,860.22 |
| 248761 | 4/28/09 | $109,860.22 |
| 249056 | 6/16/09 | $122,854.27 |
| 249138 | 6/30/09 | $109,860.22 |

LEGAL02/31581513v3

**(Recharacterization of the 1983 Substituted Note, Series Two)**

100.     The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 99 as if fully set forth herein.

101.     The moneys provided by MSSH-ILL to CMC in relation to the 1983 Substituted Note, Series Two, which MSSH-ILL characterizes as a construction loan and a secured claim, were in reality capital contributions or grants and therefore should be recharacterized as capital contributions or grants.

102.     Considering the totality of the circumstances, the MSSH-ILL's claims in relation to the 1983 Substituted Note, Series Two were intended as capital contributions or grants.

103.     Upon information and belief, no notes or documentation existed for any of the funds provided by MSSH-ILL to CMC in relation to the 1983 Substituted Note, Series Two, until 1981 despite the fact that they began to perform the Reimbursement Swaps in 1966 and material portions of 1983 Amount allocated to the 1983 Substituted Note, Series Two relate to these transactions which began in 1966.

104.     The 1983 Substituted Note, Series Two is a demand note with no maturity date.

105.     Despite the fact that the interest on the 1983 Substituted Note, Series Two is required to be paid monthly, $5,171,480.53 in interest has accumulated and remains unpaid as of the Petition Date.

106.     CMC has not made any payments of principal of the 1983 Substituted Note, Series Two, though the principal includes amounts advanced beginning in 1966 and ending 1978.  The construction loan portion of the 1983 amount that MSSH-ILL

- 20 -

separated into the 1983 Substituted Note, Series Two dates back to 1966, more than forty years ago, a period longer than the depreciable useful life of the building the funds helped to construct, as reported in CMC's audited financial statements. Upon information and belief, MSSH-ILL has not made a demand for payment with regard to the 1983 Substituted Note, Series Two for over twenty years.

107. At all relevant times, MSSH-ILL was an insider of CMC, its officers were CMC's ex-officio members and it effectively appointed the board of trustees or were ex-officio trustees.

108. The 1983 Substituted Note, Series Two has been subordinated to several secured creditors of CMC, including but not limited to Sun Life and HFA.

109. The 1983 Substituted Note, Series Two was not secured for over twenty years, and only became secured in 2005 when MSSH-ILL abused its insider status and power to force CMC to secure the 1983 Substituted Note by entering into the MSSH-ILL Mortgage. Upon information and belief, the actions taken by MSSH-ILL with regard to the MSSH-ILL Mortgage harmed CMC and disadvantaged non-insider unsecured creditors.

110. The Report of Independent Auditors of CMC for the years ended December 31, 2002 and 2001 states that CMC "has incurred recurring operating losses and has a working capital deficiency" and there is "substantial doubt about [CMC's] ability to continue as a going concern." The audited financial statements of CMC continued to contain a going concern qualification for each of the years ending December 31, 2003, 2004, 2005, 2006 and 2007 (CMC ceased to be a going concern in 2008). As such, when MSSH-ILL forced CMC to enter into the MSSH-ILL Mortgage, MSSH-ILL

knew that CMC was undercapitalized, would be unable to pay its debts as they matured and was insolvent.

111.     At all relevant times, MSSH-ILL knew, or reasonably should have known, when they extended the underlying advance to CMC that they were unlikely to be paid.

112.     Funds advanced to CMC in relation to the 1983 Substituted Note, Series Two were intended to be used to purchase capital assets or make capital improvements.

113.     There has never been a sinking fund to provide repayment of the 1983 Substituted Note, Series Two.

114.     Upon information and belief, at all relevant times the Defendant effectively controlled CMC and used this control to its advantage and to the disadvantage of CMC and CMC's non-insider unsecured creditors.

115.     Upon information and belief, at no time did CMC or MSSH-ILL actually intend for the 1983 Substituted Note, Series Two to be repaid.

116.     Accordingly, the Court should not treat the amounts provided to CMC by MSSH-ILL in relation to the 1983 Substituted Note, Series Two as debt and MSSH-ILL as a holder of a claim thereto, either unsecured or secured.  Rather, the Court should treat the amount provided by MSSH-ILL in relation to the 1983 Substituted Note, Series Two as capital contributions or grants.

<u>SECOND CAUSE OF ACTION</u>
**(Recharacterization of the 1994 Substituted Note)**

117.     The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 116 as if fully set forth herein.

118.    The moneys provided by MSSH-ILL to CMC in relation to the 1994 Substituted Note, which MSSH-ILL characterizes as a secured claim, were in reality capital contributions or grants and therefore should be recharacterized as capital contributions or grants.

119.    Considering the totality of the circumstances, MSSH-ILL's claims in relation to the 1994 Substituted Note were intended as capital contributions or grants.

120.    Upon information and belief, no notes or documentation existed for any of the amounts provided by MSSH-ILL to CMC in relation to the 1994 Substituted Note until 1981 despite the facts that (i) MSSH-ILL and CMC began to perform the Reimbursement Swaps in 1966 and (ii) of the advances from the 1983 Amount that were allocated to the initial 1983 Substituted Note, Series One pursuant to the Release Agreement, the earliest date back to at least 1970 (over thirty-five years ago). Additionally, upon information and belief, there was a four-year lapse between the maturity date of the 1987 Substituted Note, Series one and the 1994 Substituted Note during which there was no "note" relating to this supposed debt.

121.    The 1983 Substituted Note, Series One had a maturity date of December 31, 1985, which was extended to December 31, 1987 by the 1985 Substituted Note, Series One, which was extended to December 31, 1990 by the 1987 Substituted Note, Series One.  Though the December 31, 1990 came and went MSSH-ILL took no action and exercised no remedies against CMC in relation to the 1987 Substituted Note Series One.  The 1994 Substituted Note is a demand note with no maturity date.

122.     The 1994 Substituted Note and all of its predecessors (the 1983 Substituted Note, Series One, the 1985 Substituted Note, Series One and the 1987 Substituted Note, Series One) are all interest free.

123.     The entire amount of $13,617,313 under the 1994 Substituted Note remains unpaid and includes amounts that go back to 1970, over thirty-five years ago. Additionally, upon information and belief, the reductions in the principal due under the predecessors to the 1994 Substituted Note solely relate to real estate transfers to the Defendants. Upon information and belief, CMC did not make any cash payments to MSSH-ILL under the 1994 Substituted Note or its predecessors. Upon information and belief, MSSH-ILL has not made a demand for payment with regard to the 1994 Substituted Note for approximately fifteen years.

124.     The documents associated with these "Notes" effectively forbid MSSH-ILL from exercising the creditor remedies that a third party lender would take to collect on these Notes. As such, MSSH-ILL made no attempts to collect the amounts allegedly due.

125.     At all relevant times, MSSH-ILL was an insider of CMC, its officers were CMC's ex-officio members and it effectively appointed the board of trustees or were ex-officio trustees.

126.     The debt underlying the 1994 Substituted Note was unsecured for a minimum of twenty years with some portions of the debts being unsecured for thirty-five years. The 1994 Substituted Note was unsecured for over ten years. The debt underlying the 1994 Substituted Note only became secured in 2005 when MSSH-ILL abused its insider status and power to force CMC to secure the 1994 Substituted Note by entering

- 24 -

into the MSSH-ILL Mortgage. Upon information and belief, the actions taken by MSSH-ILL with regard to the MSSH-ILL Mortgage harmed CMC and disadvantaged non-insider unsecured creditors.

127. The Report of Independent Auditors of CMC for the years ended December 31, 2002 and 2001 states that CMC "has incurred recurring operating losses and has a working capital deficiency" and there is "substantial doubt about [CMC's] ability to continue as a going concern." The audited financial statements of CMC continued to contain a going concern qualification for each of the years ending December 31, 2003, 2004, 2005, 2006 and 2007 (CMC ceased to be a going concern in 2008). As such, when MSSH-ILL forced CMC to enter into the MSSH-ILL Mortgage, MSSH-ILL knew that CMC was undercapitalized, would be unable to pay its debts as they matured and was insolvent.

128. At all relevant times, MSSH-ILL knew, or reasonably should have known, when they extended the underlying advances to CMC that they were unlikely to be paid.

129. The 1994 Substituted Note has been subordinated to various third-party secured creditors of CMC.

130. There has never been a sinking fund to provide repayment of the 1994 Substituted Note.

131. Upon information and belief, at all relevant times MSSH-ILL effectively controlled CMC and used this control to its advantage.

132. Upon information and belief, at no time did CMC or MSSH-ILL actually intend for the 1994 Substituted Note to be repaid.

133.     Accordingly, the Court should not treat the amounts provided to CMC by MSSH-ILL in relation to the 1994 Substituted Note as debt and MSSH-ILL as a holder of a claim thereto, either unsecured or secured.  Rather, the Court should treat the amount provided by MSSH-ILL in relation to the 1994 Substituted Note as capital contributions or grants.

### THIRD CAUSE OF ACTION
**(Recharacterization of the 1984 Stuyvesant Mortgage Note)**

134.     The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 133 as if fully set forth herein.

135.     The money provided by MSSH-ILL to CMC in relation to the 1984 Stuyvesant Mortgage Note, which MSSH-ILL characterizes as a secured claim, was in reality a capital contribution or grant and therefore should be recharacterized as a capital contribution or grant.

136.     Considering the totality of the circumstances, MSSH-ILL's claims in relation to the 1984 Stuyvesant Mortgage Note were intended as capital contributions or grants.

137.     It is unclear as to why the 1984 Stuyvesant Mortgage Note is held by MSSH-ILL when the 1982 Stuyvesant Mortgage Note was held by MSSH-NY, and there appear to be no further loan documents describing the indebtedness associated with this loan or its purpose.

138.     The 1982 Stuyvesant Mortgage Note had a maturity date of April 1, 1986, which upon information and belief was extended until December 31, 1993 when the 1984 Stuyvesant Mortgage Note was entered into.  The maturity date of the 1984

Stuyvesant Mortgage Note came and went, and no action was taken by MSSH-ILL to recover these monies.

139.    The 1982 Stuyvesant Mortgage Note had an interest rate of 16.5% which was reduced by the 1984 Stuyvesant Mortgage Note to 8% which is to be paid annually. Despite the fact that the interest on the 1984 Stuyvesant Mortgage Note is to be paid annually, $2,127,623.33 worth of interest has accrued and remains unpaid. Upon information and belief, no interest has been paid on this loan since the late 1980's.

140.    The entire amount principal amount of $1,281,500 of the 1984 Stuyvesant Mortgage Note remains unpaid as of the Petition Date despite the maturity date being December 31, 1993.

141.    Upon information and belief, MSSH-ILL has made no attempts to collect either the principal amount of or unpaid interest on the 1984 Stuyvesant Mortgage Note.

142.    Upon information and belief, the 1984 Stuyvesant Mortgage Note was never recorded.

143.    At all relevant times, MSSH-ILL was an insider of CMC, its officers were CMC's ex-officio members and it effectively appointed the board of trustees or were ex-officio trustees.

144.    Upon information and belief, the 1984 Stuyvesant Mortgage Note was not recorded for over twenty years (137 Second Avenue was sold in 2006), and only became secured in 2005 when MSSH-ILL abused its insider status and power to force CMC to secure the 1984 Stuyvesant Mortgage Note by entering into the MSSH-ILL Mortgage.

145.     The Report of Independent Auditors of CMC for the years ended December 31, 2002 and 2001 states that CMC "has incurred recurring operating losses and has a working capital deficiency" and there is "substantial doubt about [CMC's] ability to continue as a going concern."  The audited financial statements of CMC continued to contain a going concern qualification for each of the years ending December 31, 2003, 2004, 2005, 2006 and 2007 (CMC ceased to be a going concern in 2008).  As such, when MSSH-ILL forced CMC to enter into the MSSH-ILL Mortgage, MSSH-ILL knew that CMC was undercapitalized, would be unable to pay its debts as they matured and was insolvent.

146.     Upon information and belief, the 1984 Stuyvesant Mortgage Note has been subordinated to third-party secured lenders of CMC.

147.     MSSH-ILL knew, or reasonably should have known, that CMC could not obtain conventional financing from a third party lender in an arms-length transaction. MSSH-ILL also knew, or reasonably should have known, when they extended the underlying advance to CMC that they were unlikely to be paid.

148.     There has never been a sinking fund to provide repayment of the 1984 Stuyvesant Mortgage Note.

149.     Upon information and belief, at all relevant times MSSH-ILL effectively controlled CMC and used this control to its advantage.

150.     Upon information and belief, at no time did CMC or MSSH-ILL actually intend for the 1984 Stuyvesant Mortgage Note to be repaid.

151.     Accordingly, the Court should not treat the amounts provided to CMC by MSSH-ILL in relation to the 1984 Stuyvesant Mortgage Note as debt and MSSH-ILL

- 28 -

as a holder of a claim thereto, either unsecured or secured. Rather, the Court should treat the amount provided by MSSH-ILL in relation to the 1984 Stuyvesant Mortgage Note as capital contributions or grants.

**FOURTH CAUSE OF ACTION**
**(Recharacterization of the Assigned Stuyvesant**
**Amounts and Related Secured Demand Note)**

152.     The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 151 as if fully set forth herein.

153.     Considering the totality of the circumstances, MSSH-ILL's claim in relation to the Assigned Stuyvesant Claim and Secured Demand Note was intended as a capital contribution or grant.

154.     Upon information and belief, no notes or documentation existed for the Assigned Stuyvesant Claim until the unexecuted Secured Demand Note was drafted in 2005 despite the fact that it was assigned to MSSH-ILL more than twenty years earlier, in 1985.

155.     The entire amount of $2,934,261 of the Assigned Stuyvesant Claim remained unpaid as of the Petition Date over twenty years after it was assigned to MSSH-ILL. MSSH-ILL has made no attempts to collect this money and took no action to document this debt for over twenty years.

156.     At all relevant times, MSSH-ILL was an insider of CMC, its officers were CMC's ex-officio members and it effectively appointed the board of trustees or were ex-officio trustees.

157.     The Assigned Stuyvesant Claim was not secured for over twenty years, and only became secured in 2005 when MSSH-ILL abused its insider status and

power to force CMC to secure the Assigned Stuyvesant Claim by entering into the MSSH-ILL Mortgage.

158.    Upon information and belief, the Assigned Stuyvesant Claim has been subordinated to various third-party secured creditors of CMC.

159.    The Report of Independent Auditors of CMC for the years ended December 31, 2002 and 2001 states that CMC "has incurred recurring operating losses and has a working capital deficiency" and there is "substantial doubt about [CMC's] ability to continue as a going concern."  The audited financial statements of CMC continued to contain a going concern qualification for each of the years ending December 31, 2003, 2004, 2005, 2006 and 2007 (CMC ceased to be a going concern in 2008).  As such, when MSSH-ILL forced CMC to enter into the MSSH-ILL Mortgage, MSSH-ILL knew that CMC was undercapitalized, would be unable to pay its debts as they matured and was insolvent.

160.    There has never been a sinking fund to provide repayment of the Assigned Stuyvesant Claim.

161.    Upon information and belief, at all relevant times the Defendant effectively controlled CMC and used this control to its advantage.

162.    Upon information and belief, at no time did CMC or MSSH-ILL actually intend for the Assigned Stuyvesant Claim to be repaid.

163.    Accordingly, the Court should not treat the amounts related to the Assigned Stuyvesant Claim as debt and MSSH-ILL as a holder of a claim thereto, either unsecured or secured.  Rather, the Court should treat the Assigned Stuyvesant Claim and the Secured Demand Note as capital contributions or grants.

- 30 -

## FIFTH CAUSE OF ACTION
### (Recharacterization of the 2004 Promissory Note)

164.    The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 163 as if fully set forth herein.

165.    The moneys provided by MSSH-NY to CMC in relation to the 2004 Promissory Note and underlying transactions there (including but not limited to the Gap Note and 2001 Promissory Note), which MSSH-NY characterizes as a secured claim, were in reality capital contributions or grants and therefore should be recharacterized as capital contributions or grants.

166.    Considering the totality of the circumstances, MSSH-NY's claims in relation to the 2004 Promissory Note were intended as capital contributions or grants.

167.    Based upon the fixed interest rate of 5.57% on the 2004 Promissory Note and the spread of 130 bps over the 10 Year Treasury Note on the underlying NorthMarq Capital loan, MSSH-NY bears the risk associated with the changing market interest rates and at times has actually been losing money on the 2004 Promissory Notes due to the fact that they pay NorthMarq Capital more interest in a given month than they collect from CMC.  This is clearly not an arms length transaction into which any third-party lender would enter.

168.    MSSH-NY provided money to CMC when MSSH-NY knew that knew that CMC was undercapitalized, would be unable to pay its debts as they matured and was insolvent.

169.    At all relevant times, MSSH-NY was an insider of CMC, its officers were CMC's ex-officio members and it effectively appointed the board of trustees or were ex-officio trustees.

LEGAL02/31581513v3

170.     The 2004 Promissory Note only became secured in 2005 when MSSH-NY abused its insider status and power to force CMC to secure the 2004 Promissory Note by entering into the MSSH-NY Mortgage.

171.     The Report of Independent Auditors of CMC for the years ended December 31, 2002 and 2001 states that CMC "has incurred recurring operating losses and has a working capital deficiency" and there is "substantial doubt about [CMC's] ability to continue as a going concern." The audited financial statements of CMC continued to contain a going concern qualification for each of the years ending December 31, 2003, 2004, 2005, 2006 and 2007 (CMC ceased to be a going concern in 2008). As such, when MSSH-ILL forced CMC to enter into the MSSH-ILL Mortgage, MSSH-ILL knew that CMC was undercapitalized, would be unable to pay its debts as they matured and was insolvent.

172.     The 2004 Promissory Note has been subordinated to various third-party secured creditors of CMC, including but not limited to Sun Life.

173.     MSSH-NY knew, or reasonably should have known, that CMC could not obtain conventional financing from a third party lender in an arms-length transaction.

174.     MSSH-NY benefited from the 2004 Promissory Note by allowing it to pay off the Doral Promissory Note which was secured by assets of the Defendants to the detriment of CMC's other creditors. Upon information and belief, CMC only netted $531,940.51 from the 2004 Promissory Note.

175.     There has never been a sinking fund to provide repayment of the 2004 Promissory Note.

176.     Upon information and belief, at all relevant times the Defendant effectively controlled CMC and used this control to its advantage.

177.     Accordingly, the Court should not treat the amounts provided to CMC by MSSH-NY in relation to the 2004 Promissory Note as debt and MSSH-NY as a holder of a claim thereto, either unsecured or secured.  Rather, the Court should treat the amount provided by MSSH-NY in relation to the 2004 Promissory Note and underlying transactions as capital contributions or grants.

<u>**SIXTH CAUSE OF ACTION**</u>
**(Recharacterization of the MSSH-NY Unsecured Claims)**

178.     The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 177 as if fully set forth herein.

179.     The moneys provided by MSSH-NY to CMC in relation to the MSSH-NY Unsecured Claims were in reality capital contributions or grants and therefore should be recharacterized as capital contributions or grants.

180.     Considering the totality of the circumstances, MSSH-NY's claims in relation to the MSSH-NY Unsecured Claims were intended as capital contributions or grants.

181.     No notes or documentation existed for a significant amount of the MSSH-NY Unsecured Claims, and thus they have no interest rate or maturity date.

182.     The Report of Independent Auditors of CMC for the years ended December 31, 2002 and 2001 states that CMC "has incurred recurring operating losses and has a working capital deficiency" and there is "substantial doubt about [CMC's] ability to continue as a going concern."  The audited financial statements of CMC continued to contain a going concern qualification for each of the years ending December

- 33 -

31, 2003, 2004, 2005, 2006 and 2007 (CMC ceased to be a going concern in 2008). As such, when MSSH-ILL forced CMC to enter into the MSSH-ILL Mortgage, MSSH-ILL knew that CMC was undercapitalized, would be unable to pay its debts as they matured and was insolvent.

183.     Almost all of the related advances to the MSSH-NY Unsecured Claims were provided after the Berger Commission's recommendations were released to the public and MSSH-NY was aware that CMC would be closing and would thus be unable to repay the amounts owed on the MSSH-NY Unsecured Claims.

184.     At all relevant times, MSSH-NY was an insider of CMC, its officers were CMC's ex-officio members and it effectively appointed the board of trustees or were ex-officio trustees.

185.     The MSSH-NY Unsecured Claims are not secured.

186.     MSSH-NY knew, or reasonably should have known, that CMC could not obtain conventional financing from a third party lender in an arms-length transaction. MSSH-NY also knew, or reasonably should have known, when they extended the underlying advance to CMC that they were unlikely to be paid.

187.     There has never been a sinking fund to provide repayment of the MSSH-NY Unsecured Claims.

188.     Upon information and belief, at all relevant times the Defendant effectively controlled CMC and used this control to its advantage.

189.     Upon information and belief, at no time did CMC or MSSH-NY actually intend for the MSSH-NY Unsecured Claims to be repaid.

190.     Accordingly, the Court should not treat the amounts provided to CMC by MSSH-NY in relation to the MSSH-NY Unsecured Claims as debt and MSSH-NY as a holder of a claim thereto, either unsecured or secured.  Rather, the Court should treat the amount provided by MSSH-NY in relation to the MSSH-NY Unsecured Claims as capital contributions or grants.

## SEVENTH CAUSE OF ACTION
### (Cancellation of MSSH-ILL and MSSH-NY's Liens)

191.     The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 190 as if fully set forth herein.

192.     The MSSH-ILL Mortgage and the related lien thereto exist solely to secure (1) the 1983 Substituted Note, Series One, (2) the 1994 Substituted Note, (3) the 1984 Stuyvesant Mortgage Note, (4) the Assigned Stuyvesant Claim and (5) the Allied Irish Bank Guarantee.

193.     The MSSH-NY Mortgage and the related liens thereto exist solely to secure the 2004 Promissory Note.

194.     To the extent the Court determines that the debt evidenced by (1) the 1983 Substituted Note, Series One, (2) the 1994 Substituted Note, (3) the 1984 Stuyvesant Mortgage Note, (4) the Assigned Stuyvesant Claim, (5) the Allied Irish Bank Guarantee or (6) the 2004 Promissory Note should be recharacterized as capital contributions or grants or declared otherwise invalid, and cancels the indebtedness relating thereto, the MSSH-ILL Mortgage, MSSH-NY Mortgage and related liens thereto should be cancelled to the same extent.

## EIGHTH CAUSE OF ACTION
### (Duplicative Claims)

195.    The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through __ as if fully set forth herein.

196.    The MSSH-ILL Mortgage purports to secure the Allied Irish Bank Guarantee.

197.    Upon information and belief, the MSSH-ILL Unsecured Scheduled Claim is on account of the Allied Irish Bank Guarantee and is for $3 million.

198.    By reason of the foregoing, the Allied Irish Bank Guarantee claim purported to be secured by the MSSH-ILL Mortgage and the MSSH-ILL Unsecured Scheduled Claim should be declared duplicative and MSSH-ILL should not be permitted to recover on behalf of both.

## NINTH CAUSE OF ACTION
### (Declaring the Allied Irish Loan Guarantee Not to be a Claim Against CMC)

199.    The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 198 as if fully set forth herein.

200.    The MSSH-ILL Mortgage purports to secure the Allied Irish Bank Guarantee.

201.    Upon information and belief, the MSSH-ILL Unsecured Scheduled Claim is on account of the Allied Irish Bank Guarantee and is for $3 million.

202.    Upon information and belief, the Allied Irish Loan Guarantee is the result of that certain Commercial Guarantee dated September 29, 2000 between Allied Irish Bank, p.l.c., as Lender, and MSSH-ILL, as Guarantor, pursuant to which MSSH-ILL

guaranteed a borrowing of CDC from Allied Irish Bank, p.l.c. in the principal amount of $3 million.

203.    By reason of the foregoing, (i) the Allied Irish Bank Guarantee claim purported to be secured by the MSSH-ILL Mortgage and the MSSH-ILL Unsecured Schedules Claim should be declared not to be a claim against CMC but rather a claim against CDC, a non-debtor entity, and (ii) any claims on account of the Allied Irish Bank Guarantee against CMC should be denied.

## TENTH CAUSE OF ACTION
### (Equitable Subordination Pursuant to
### 11 U.S.C. § 510(c) of the 1983 Substituted Note, Series Two)

204.    The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 203 as if fully set forth herein.

205.    The equities in this case dictate that the amounts the Debtor allegedly owes to MSSH-ILL pursuant to the 1983 Substituted Note, Series Two should be subordinated to the claims of all of the Debtor's other creditors under 11 U.S.C. § 510(c). Such equitable subordination is necessary because MSSH-ILL's inequitable conduct provided MSSH-ILL with an unfair advantage and resulted in an injury to the Debtor's unsecured creditors.

206.    As an insider, MSSH-ILL's actions relating to CMC are subjected to a higher level of scrutiny in determining whether those actions constitute the inequitable conduct necessary to justify the equitable subordination of their claims against the Debtor.

207.    MSSH-ILL engaged in inequitable conduct.  Upon information and belief, MSSH-ILL's inequitable conduct includes (1) advancing the amounts related to the 1983

Substituted Note, Series Two without expecting payment in return, for the purpose of obtaining reimbursements from Medicare/Medicaid: (2) abusing its position as an insider to force CMC to secure the 1983 Substituted Note, Series Two to the detriment of CMC's other creditors at a time when MSSH-ILL knew that the amounts related to the 1983 Substituted Note, Series Two were unlikely ever to be repaid: (3) breaching its fiduciary duty/duty of loyalty to CMC by using its insider status to force CMC to secure the 1983 Substituted Note, Series Two: and (4) breaching its fiduciary duty to CMC's creditors by using its insider status to (a) gain an advantage over other unsecured creditors, (b) secure its unsecured claims and (c) favor its own interests and payment above those to other creditors of CMC, at a time when CMC was unable to pay its debts as they matured and was insolvent or in the zone of insolvency, and CMC's had already received going-concern qualifications from its independent auditors reflecting substantial doubts about CMC's ability to continue operations.

208.    MSSH-ILL kept CMC artificially afloat so that MSSH-ILL could improve its position prior to CMC's inevitable demise.  This prolongation of the insolvent or near-insolvent Debtor's existence damaged its creditors by inducing them to provide goods and services for which they did not get repaid.

209.    Upon information and belief, the Defendants also desired to acquire the protections of debt and to avoid the uncertainties and burdens of contributing capital.

210.    MSSH-ILL knew or should have known that, without the infusion of sufficient capital, CMC would be unable to meet its obligations to trade creditors and other unsecured creditors as they became due.

211.    In taking the aforementioned actions, the Defendants:

(a)     had full opportunity to determine the then existing financial condition of CMC; and

(b)     had the full opportunity to determine what CMC's ability would be to pay its obligations as they came due in the ordinary course of business, including obligations owed to general unsecured creditors.

212.    The general unsecured creditors, on the other hand:

(a)     did not have access to the financial information concerning CMC that was available to the Defendants, who were insiders of CMC;

(b)     did not have the same opportunity as the Defendants to assess what CMC's ability would be to pay its obligations in the ordinary course of its business after each transaction and action; and

(c)     did not know about the inequitable conduct of MSSH-ILL.

213.    Accordingly, MSSH-ILL took unfair advantage of CMC and its unsecured creditors by virtue of their insider position and control over CMC.

214.    This inequitable conduct resulted in substantial value to MSSH-ILL in the form of the 1983 Substituted Note, Series Two and the MSSH-ILL Mortgage.

215.    By reason of the foregoing, CMC's general unsecured creditors were harmed.

216.    Allowing MSSH-ILL, an insider of CMC, to receive payment on its claims associated with the 1983 Substituted Note, Series Two prior to the unsecured creditors receiving payment, would be unfair and inequitable.

- 39 -

217.    Equitable subordination of MSSH-ILL's claims associated with the 1983 Substituted Note, Series Two is consistent with the Bankruptcy Code.

218.    Accordingly, MSSH-ILL's claims associated with the 1983 Substituted Note, Series Two should be equitably subordinated to the claims of all general unsecured creditors and the related liens thereto transferred to the estate pursuant to § 510(c) of the Bankruptcy Code.

### ELEVENTH CAUSE OF ACTION
**(Equitable Subordination Pursuant to**
**11 U.S.C. § 510(c) of the 1994 Substituted Note)**

219.    The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 218 as if fully set forth herein.

220.    The equities in this case dictate that the amounts the Debtor allegedly owes to MSSH-ILL pursuant to the 1994 Substituted Note should be subordinated to the claims of all of the Debtor's other creditors under 11 U.S.C. § 510(c).  Such equitable subordination is necessary because MSSH-ILL's inequitable conduct provided MSSH-ILL with an unfair advantage and resulted in an injury to the Debtor's unsecured creditors.

221.    As an insider, MSSH-ILL's actions relating to CMC are subjected to a higher level of scrutiny in determining whether those actions constitute the inequitable conduct necessary to justify the equitable subordination of their claims against the Debtor.

222.    MSSH-ILL engaged in inequitable conduct.  Upon information and belief, MSSH-ILL's inequitable conduct includes (1) advancing the amounts related to the 1994 Substituted Note without expecting payment in return, for the purpose of obtaining

reimbursements from Medicare/Medicaid; (2) abusing its position as an insider to force CMC to secure the 1994 Substituted Note to the detriment of CMC's other creditors at a time when MSSH-ILL knew that the amounts related to the 1994 Substituted Note were unlikely ever to be repaid; (3) breaching its fiduciary duty/duty of loyalty to CMC by using its insider status to force CMC to secure the 1994 Substituted Note; and (4) breaching its fiduciary duty to CMC's creditors by using its insider status to (a) gain an advantage over other unsecured creditors, (b) secure its unsecured claims and (c) favor its own interests and payment above those to other creditors of CMC, at a time when CMC was unable to pay its debts as they matured and was insolvent or in the zone of insolvency, and CMC's had already received going-concern qualifications from its independent auditors reflecting substantial doubts about CMC's ability to continue operations.

223.    MSSH-ILL kept CMC artificially afloat so that MSSH-ILL could improve its position prior to CMC's inevitable demise.  This prolongation of the insolvent or near-insolvent Debtor's existence damaged its creditors by inducing them to provide goods and services for which they did not get repaid.

224.    Upon information and belief, the Defendants also desired to acquire the protections of debt and to avoid the uncertainties and burdens of contributing capital.

225.    MSSH-ILL knew or should have known that, without the infusion of sufficient capital, CMC would be unable to meet its obligations to trade creditors and other unsecured creditors as they became due.

226.    In taking the aforementioned actions, the Defendants:

(a)     had full opportunity to determine the then existing financial condition of CMC; and

(b)     had the full opportunity to determine what CMC's ability would be to pay its obligations as they came due in the ordinary course of business, including obligations owed to general unsecured creditors.

227.     The general unsecured creditors, on the other hand:

(a)     did not have access to the financial information concerning CMC that was available to the Defendants, who were insiders of CMC;

(b)     did not have the same opportunity as the Defendants to assess what CMC's ability would be to pay its obligations in the ordinary course of its business after each transaction and action; and

(c)     did not know about the inequitable conduct of MSSH-ILL.

228.     Accordingly, MSSH-ILL took unfair advantage of CMC and its unsecured creditors by virtue of their insider position and control over CMC.

229.     This inequitable conduct resulted in substantial value to MSSH-ILL in the form of the 1994 Substituted Note and the MSSH-ILL Mortgage.

230.     By reason of the foregoing, CMC's general unsecured creditors were harmed.

231.     Allowing MSSH-ILL, an insider of CMC, to receive payment on its claims associated with the 1994 Substituted Note prior to the unsecured creditors receiving payment, would be unfair and inequitable.

- 42 -

232.     Equitable subordination of MSSH-ILL's claims associated with the 1994 Substituted Note is consistent with the Bankruptcy Code.

233.     Accordingly, MSSH-ILL's claims associated with the 1994 Substituted Note should be equitably subordinated to the claims of all general unsecured creditors and the related liens thereto transferred to the estate pursuant to § 510(c) of the Bankruptcy Code.

**TWELFTH CAUSE OF ACTION**
**(Equitable Subordination Pursuant to**
**11 U.S.C. § 510(c) of the 1984 Stuyvesant Mortgage Note)**

234.     The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 233 as if fully set forth herein.

235.     The equities in this case dictate that the amounts the Debtor allegedly owes to MSSH-ILL pursuant to the 1984 Stuyvesant Mortgage Note should be subordinated to the claims of all of the Debtor's other creditors under 11 U.S.C. § 510(c). Such equitable subordination is necessary because MSSH-ILL's inequitable conduct provided MSSH-ILL with an unfair advantage and resulted in an injury to the Debtor's unsecured creditors.

236.     As an insider, MSSH-ILL's actions relating to CMC are subjected to a higher level of scrutiny in determining whether those actions constitute the inequitable conduct necessary to justify the equitable subordination of their claims against the Debtor.

237.     MSSH-ILL engaged in inequitable conduct.  Upon information and belief, MSSH-ILL's inequitable conduct includes (1) advancing the amounts related to the 1984 Stuyvesant Mortgage Note without expecting payment in return; (2) abusing its position

as an insider to force CMC to secure the 1984 Stuyvesant Mortgage Note to the detriment of CMC's other creditors at a time when MSSH-ILL knew that the amounts related to the 1984 Stuyvesant Mortgage Note was unlikely ever to be repaid; (3) breaching its fiduciary duty/duty of loyalty to CMC by using its insider status to force CMC to secure the 1984 Stuyvesant Mortgage Note; and (4) breaching its fiduciary duty to CMC's creditors by using its insider status to (a) gain an advantage over other unsecured creditors, (b) secure its unsecured claims and (c) favor its own interests and payment above those to other creditors of CMC, at a time when CMC was unable to pay its debts as they matured and was insolvent or in the zone of insolvency, and CMC's had already received going-concern qualifications from its independent auditors reflecting substantial doubts about CMC's ability to continue operations.

238.    MSSH-ILL kept CMC artificially afloat so that MSSH-ILL could improve its position prior to CMC's inevitable demise.  This prolongation of the insolvent or near-insolvent Debtor's existence damaged its creditors by inducing them to provide goods and services for which they did not get repaid.

239.    Upon information and belief, the Defendants also desired to acquire the protections of debt and to avoid the uncertainties and burdens of contributing capital.

240.    MSSH-ILL knew or should have known that, without the infusion of sufficient capital, CMC would be unable to meet its obligations to trade creditors and other unsecured creditors as they became due.

241.    In taking the aforementioned actions, the Defendants:

(a)    had full opportunity to determine the then existing financial condition of CMC; and

(b)     had the full opportunity to determine what CMC's ability would be to pay its obligations as they came due in the ordinary course of business, including obligations owed to general unsecured creditors.

242.     The general unsecured creditors, on the other hand:

(a)     did not have access to the financial information concerning CMC that was available to the Defendants, who were insiders of CMC;

(b)     did not have the same opportunity as the Defendants to assess what CMC's ability would be to pay its obligations in the ordinary course of its business after each transaction and action; and

(c)     did not know about the inequitable conduct of MSSH-ILL.

243.     Accordingly, MSSH-ILL took unfair advantage of CMC and its unsecured creditors by virtue of their insider position and control over CMC.

244.     This inequitable conduct resulted in substantial value to MSSH-ILL in the form of the 1984 Stuyvesant Mortgage Note and the MSSH-ILL Mortgage.

245.     By reason of the foregoing, CMC's general unsecured creditors were harmed.

246.     Allowing MSSH-ILL, an insider of CMC, to receive payment on its claims associated with the 1984 Stuyvesant Mortgage Note prior to the unsecured creditors receiving payment, would be unfair and inequitable.

247.     Equitable subordination of MSSH-ILL's claims associated with the 1984 Stuyvesant Mortgage Note is consistent with the Bankruptcy Code.

248.     Accordingly, MSSH-ILL's claims associated with the 1984 Stuyvesant Mortgage Note should be equitably subordinated to the claims of all general unsecured

- 45 -

creitors and the related liens thereto transferred to the estate pursuant to § 510(c) of the

Bankruptcy Code.

### THIRTEENTH CAUSE OF ACTION
**(Equitable Subordination Pursuant to
11 U.S.C. § 510(c) of the Assigned Stuyvesant Claim)**

249.    The Committee repeats and realleges the allegations set forth in the

preceding paragraphs numbered 1 through 248 as if fully set forth herein.

250.    The equities in this case dictate that the amounts the Debtor allegedly

owes to MSSH-ILL pursuant to the Assigned Stuyvesant Claim should be subordinated to

the claims of all of the Debtor's other creditors under 11 U.S.C. § 510(c).  Such equitable

subordination is necessary because MSSH-ILL's inequitable conduct provided MSSH-

ILL with an unfair advantage and resulted in an injury to the Debtor's unsecured

creditors.

251.    As an insider, MSSH-ILL's actions relating to CMC are subjected to a

higher level of scrutiny in determining whether those actions constitute the inequitable

conduct necessary to justify the equitable subordination of their claims against the

Debtor.

252.    MSSH-ILL engaged in inequitable conduct.  Upon information and belief,

MSSH-ILL's inequitable conduct includes (1) advancing the amounts related to the

Assigned Stuyvesant Claim without expecting payment in return; (2) abusing its position

as an insider to force CMC to secure the Assigned Stuyvesant Claim to the detriment of

CMC's other creditors at a time when MSSH-ILL knew that the amounts related to the

Assigned Stuyvesant Claim was unlikely ever to be repaid; (3) breaching its fiduciary

duty/duty of loyalty to CMC by using its insider status to force CMC to secure the

Assigned Stuyvesant Claim; and (4) breaching its fiduciary duty to CMC's creditors by using its insider status to (a) gain an advantage over other unsecured creditors, (b) secure its unsecured claims and (c) favor its own interests and payment above those to other creditors of CMC, at a time when CMC was unable to pay its debts as they matured and was insolvent or in the zone of insolvency, and CMC's had already received going-concern qualifications from its independent auditors reflecting substantial doubts about CMC's ability to continue operations.

253.    MSSH-ILL kept CMC artificially afloat so that MSSH-ILL could improve its position prior to CMC's inevitable demise.  This prolongation of the insolvent or near-insolvent Debtor's existence damaged its creditors by inducing them to provide goods and services for which they did not get repaid.

254.    Upon information and belief, the Defendants also desired to acquire the protections of debt and to avoid the uncertainties and burdens of contributing capital.

255.    MSSH-ILL knew or should have known that, without the infusion of sufficient capital, CMC would be unable to meet its obligations to trade creditors and other unsecured creditors as they became due.

256.    In taking the aforementioned actions, the Defendants:

(a)    had full opportunity to determine the then existing financial condition of CMC; and

(b)    had the full opportunity to determine what CMC's ability would be to pay its obligations as they came due in the ordinary course of business, including obligations owed to general unsecured creditors.

257.    The general unsecured creditors, on the other hand:

- 47 -

(a)     did not have access to the financial information concerning CMC that was available to the Defendants, who were insiders of CMC;

(b)     did not have the same opportunity as the Defendants to assess what CMC's ability would be to pay its obligations in the ordinary course of its business after each transaction and action; and

(c)     did not know about the inequitable conduct of MSSH-ILL.

258.    Accordingly, MSSH-ILL took unfair advantage of CMC and its unsecured creditors by virtue of their insider position and control over CMC.

259.    This inequitable conduct resulted in substantial value to MSSH-ILL in the form of the Assigned Stuyvesant Claim and the MSSH-ILL Mortgage.

260.    By reason of the foregoing, CMC's general unsecured creditors were harmed.

261.    Allowing MSSH-ILL, an insider of CMC, to receive payment on its claims associated with the Assigned Stuyvesant Claim prior to the unsecured creditors receiving payment, would be unfair and inequitable.

262.    Equitable subordination of MSSH-ILL's claims associated with the Assigned Stuyvesant Claim is consistent with the Bankruptcy Code.

263.    Accordingly, MSSH-ILL's claims associated with the Assigned Stuyvesant Claim should be equitably subordinated to the claims of all general unsecured creditors and the related liens thereto transferred to the estate pursuant to § 510(c) of the Bankruptcy Code.

## FOURTEENTH CAUSE OF ACTION
### (Equitable Subordination Pursuant to
### 11 U.S.C. § 510(c) of the Allied Irish Bank Guarantee)

264.    The Committee repeats and realleges the allegations set forth in the
preceding paragraphs numbered 1 through 263 as if fully set forth herein.

265.    The equities in this case dictate that the amounts the Debtor allegedly
owes to MSSH-ILL pursuant to the Allied Irish Bank Guarantee should be subordinated
to the claims of all of the Debtor's other creditors under 11 U.S.C. § 510(c).  Such
equitable subordination is necessary because MSSH-ILL's inequitable conduct provided
MSSH-ILL with an unfair advantage and resulted in an injury to the Debtor's unsecured
creditors.

266.    As an insider, MSSH-ILL's actions relating to CMC are subjected to a
higher level of scrutiny in determining whether those actions constitute the inequitable
conduct necessary to justify the equitable subordination of their claims against the
Debtor.

267.    MSSH-ILL engaged in inequitable conduct.  Upon information and belief,
MSSH-ILL's inequitable conduct includes (1) abusing its position as an insider to force
CMC to secure the Allied Irish Bank Guarantee to the detriment of CMC's other creditors
at a time when MSSH-ILL knew that the amounts related to the Allied Irish Bank
Guarantee was unlikely ever to be repaid and was not a debt of CMC; (2) breaching its
fiduciary duty/duty of loyalty to CMC by using its insider status to force CMC to secure
the Allied Irish Bank Guarantee; and (3) breaching its fiduciary duty to CMC's creditors
by using its insider status to (a) gain an advantage over other unsecured creditors, (b)
secure its unsecured claims and (c) favor its own interests and payment above those to

other creditors of CMC, at a time when CMC was unable to pay its debts as they matured and was insolvent or in the zone of insolvency, and CMC's had already received going-concern qualifications from its independent auditors reflecting substantial doubts about CMC's ability to continue operations.

268.    MSSH-ILL kept CMC artificially afloat so that MSSH-ILL could improve its position prior to CMC's inevitable demise. This prolongation of the insolvent or near-insolvent Debtor's existence damaged its creditors by inducing them to provide goods and services for which they did not get repaid.

269.    Upon information and belief, the Defendants also desired to acquire the protections of debt and to avoid the uncertainties and burdens of contributing capital.

270.    MSSH-ILL knew or should have known that, without the infusion of sufficient capital, CMC would be unable to meet its obligations to trade creditors and other unsecured creditors as they became due.

271.    In taking the aforementioned actions, the Defendants:

(a)    had full opportunity to determine the then existing financial condition of CMC; and

(b)    had the full opportunity to determine what CMC's ability would be to pay its obligations as they came due in the ordinary course of business, including obligations owed to general unsecured creditors.

272.    The general unsecured creditors, on the other hand:

(a)    did not have access to the financial information concerning CMC that was available to the Defendants, who were insiders of CMC;

- 50 -

(b)     did not have the same opportunity as the Defendants to assess what CMC's ability would be to pay its obligations in the ordinary course of its business after each transaction and action; and

(c)     did not know about the inequitable conduct of MSSH-ILL.

273.     Accordingly, MSSH-ILL took unfair advantage of CMC and its unsecured creditors by virtue of their insider position and control over CMC.

274.     This inequitable conduct resulted in substantial value to MSSH-ILL in the form of the Allied Irish Bank Guarantee and the MSSH-ILL Mortgage.

275.     By reason of the foregoing, CMC's general unsecured creditors were harmed.

276.     Allowing MSSH-ILL, an insider of CMC, to receive payment on its claims associated with the Allied Irish Bank Guarantee prior to the unsecured creditors receiving payment, would be unfair and inequitable.

277.     Equitable subordination of MSSH-ILL's claims associated with the Allied Irish Bank Guarantee is consistent with the Bankruptcy Code.

278.     Accordingly, MSSH-ILL's claims associated with the Allied Irish Bank Guarantee should be equitably subordinated to the claims of all general unsecured creditors and the related liens thereto transferred to the estate pursuant to § 510(c) of the Bankruptcy Code.

### FIFTEENTH CAUSE OF ACTION
**(Equitable Subordination Pursuant to
11 U.S.C. § 510(c) of the 2004 Promissory Note)**

279.     The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 278 as if fully set forth herein.

280.     The equities in this case dictate that the amounts the Debtor allegedly

owes to MSSH-NY pursuant to the 2004 Promissory Note should be subordinated to the

claims of all of the Debtor's other creditors under 11 U.S.C. § 510(c).  Such equitable

subordination is necessary because MSSH-NY's inequitable conduct provided MSSH-

NY with an unfair advantage and resulted in an injury to the Debtor's unsecured

creditors.

281.     As insiders, MSSH-NY's actions relating to CMC are subjected to a

higher level of scrutiny in determining whether those actions constitute the inequitable

conduct necessary to justify the equitable subordination of their claims against the

Debtor.

282.     MSSH-NY engaged in inequitable conduct.  Upon information and belief,

MSSH-NY's inequitable conduct includes; (1) advancing the amounts related to the 2004

Promissory Note without expecting payment in return; (2) abusing its position as an

insider to force CMC to secure the 2004 Promissory Note to the detriment of CMC's

other creditors at a time when MSSH-NY knew that the amounts related to the 2004

Promissory Note was unlikely ever to be repaid; (3) breaching its fiduciary duty/duty of

loyalty to CMC by using its insider status to force CMC to secure the 2004 Promissory

Note; and (4) breaching its fiduciary duty to CMC's creditors by using its insider status to

(a) gain an advantage over other unsecured creditors, (b) secure its unsecured claims and

(c) favor its own interests and payment above those to other creditors of CMC, at a time

when CMC was unable to pay its debts as they matured and was insolvent or in the zone

of insolvency, and CMC's had already received going-concern qualifications from its

independent auditors reflecting substantial doubts about CMC's ability to continue operations.

283.     MSSH-NY kept CMC artificially afloat so that MSSH-NY could improve its position prior to CMC's inevitable demise.  This prolongation of the insolvent or near-insolvent Debtor's existence damaged its creditors by inducing them to provide goods and services for which they did not get repaid.

284.     Upon information and belief, the Defendants also desired to acquire the protections of debt and to avoid the uncertainties and burdens of contributing capital.

285.     MSSH-NY knew or should have known that, without the infusion of sufficient capital, CMC would be unable to meet its obligations to trade creditors and other unsecured creditors as they became due.

286.     In taking the aforementioned actions, the Defendants:

(a)     had full opportunity to determine the then existing financial condition of CMC; and

(b)     had the full opportunity to determine what CMC's ability would be to pay its obligations as they came due in the ordinary course of business, including obligations owed to general unsecured creditors.

287.     The general unsecured creditors, on the other hand:

(a)     did not have access to the financial information concerning CMC that was available to the Defendants, who were insiders of CMC;

(b)     did not have the same opportunity as the Defendants to assess what CMC's ability would be to pay its obligations in the ordinary course of its business after each transaction and action; and

(c)     did not know about the inequitable conduct of MSSH-NY.

288.    Accordingly, MSSH-NY took unfair advantage of CMC and its unsecured creditors by virtue of their insider position and control over CMC.

289.    This inequitable conduct resulted in substantial value to MSSH-NY in the form of the 2004 Promissory Note and the MSSH-NY Mortgage.

290.    By reason of the foregoing, CMC's general unsecured creditors were harmed.

291.    Allowing MSSH-NY, an insider of CMC, to receive payment on its claims associated with the 2004 Promissory Note prior to the unsecured creditors receiving payment, would be unfair and inequitable.

292.    Equitable subordination of MSSH-NY's claims associated with the 2004 Promissory Note is consistent with the Bankruptcy Code.

293.    Accordingly, MSSH-NY's claims associated with the 2004 Promissory Note should be equitably subordinated to the claims of all general unsecured creditors and the related liens thereto transferred to the estate pursuant to § 510(c) of the Bankruptcy Code.

### SIXTEENTH CAUSE OF ACTION
**(Equitable Subordination Pursuant to**
**11 U.S.C. § 510(c) of the MSSH-ILL Mortgage and Related Liens)**

294.    The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 293 as if fully set forth herein.

295.    The equities in this case dictate that the amounts the Debtor allegedly owes to MSSH-ILL pursuant to the MSSH-ILL Mortgage should be subordinated to the claims of all of the Debtor's other creditors and the related liens transferred to the estate

under 11 U.S.C. § 510(c). Such equitable subordination is necessary because MSSH-ILL's inequitable conduct provided MSSH-ILL with an unfair advantage and resulted in an injury to the Debtor's unsecured creditors.

296. As an insider, MSSH-ILL's actions relating to CMC are subjected to a higher level of scrutiny in determining whether those actions constitute the inequitable conduct necessary to justify the equitable subordination of their claims against the Debtor.

297. MSSH-ILL engaged in inequitable conduct. Upon information and belief, MSSH-ILL's inequitable conduct includes (1) advancing the amounts related to the MSSH-ILL Mortgage without expecting payment in return; (2) abusing its position as an insider to force CMC to enter into the MSSH-ILL Mortgage to the detriment of CMC's other creditors at a time when MSSH-ILL knew that the amounts related to the MSSH-ILL Mortgage were unlikely ever to be repaid; (3) breaching its fiduciary duty/duty of loyalty to CMC by using its insider status to force CMC to secure the amounts underlying the MSSH-ILL Mortgage; and (4) breaching its fiduciary duty to CMC's creditors by using its insider status to (a) gain an advantage over other unsecured creditors, (b) secure its unsecured claims and (c) favor its own interests and payment above those to other creditors of CMC, at a time when CMC was unable to pay its debts as they matured and was insolvent or in the zone of insolvency, and CMC's had already received going-concern qualifications from its independent auditors reflecting substantial doubts about CMC's ability to continue operations.

298. MSSH-ILL kept CMC artificially afloat so that MSSH-ILL could improve its position prior to CMC's inevitable demise. This prolongation of the insolvent or near-

insolvent Debtor's existence damaged its creditors by inducing them to provide goods and services for which they did not get repaid.

299.     Upon information and belief, the Defendants also desired to acquire the protections of debt and to avoid the uncertainties and burdens of contributing capital.

300.     MSSH-ILL knew or should have known that, without the infusion of sufficient capital, CMC would be unable to meet its obligations to trade creditors and other unsecured creditors as they became due.

301.     In taking the aforementioned actions, the Defendants:

(a)     had full opportunity to determine the then existing financial condition of CMC; and

(b)     had the full opportunity to determine what CMC's ability would be to pay its obligations as they came due in the ordinary course of business, including obligations owed to general unsecured creditors.

302.     The general unsecured creditors, on the other hand:

(a)     did not have access to the financial information concerning CMC that was available to the Defendants, who were insiders of CMC;

(b)     did not have the same opportunity as the Defendants to assess what CMC's ability would be to pay its obligations in the ordinary course of its business after each transaction and action; and

(c)     did not know about the inequitable conduct of MSSH-ILL.

303.     Accordingly, MSSH-ILL took unfair advantage of CMC and its unsecured creditors by virtue of their insider position and control over CMC.

304.    This inequitable conduct resulted in substantial value to MSSH-ILL in the form of the MSSH-ILL Mortgage and the related liens.

305.    By reason of the foregoing, CMC's general unsecured creditors were harmed.

306.    Allowing MSSH-ILL, an insider of CMC, to receive payment on its claims associated with the MSSH-ILL Mortgage or to maintain its related liens thereto prior to the unsecured creditors receiving payment, would be unfair and inequitable.

307.    Equitable subordination of MSSH-ILL's claims associated with MSSH-ILL Mortgage and the transfer of the liens related thereto to the estate is consistent with the Bankruptcy Code.

308.    Accordingly, MSSH-ILL's claims associated with the MSSH-ILL Mortgage should be equitably subordinated to the claims of all general unsecured creditors and the related liens thereto transferred to the estate pursuant to § 510(c) of the Bankruptcy Code.

**SEVENTEENTH CAUSE OF ACTION**
**(Equitable Subordination Pursuant to**
**11 U.S.C. § 510(c) of the MSSH-NY Mortgage and Related Liens)**

309.    The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 308 as if fully set forth herein.

310.    The equities in this case dictate that the amounts the Debtor allegedly owes to MSSH-NY pursuant to the MSSH-NY Mortgage should be subordinated to the claims of all of the Debtor's other creditors and the related liens transferred to the estate under 11 U.S.C. § 510(c).  Such equitable subordination is necessary because MSSH-

NY's inequitable conduct provided MSSH-NY with an unfair advantage and resulted in an injury to the Debtor's unsecured creditors.

311.    As an insider, MSSH-NY's actions relating to CMC are subjected to a higher level of scrutiny in determining whether those actions constitute the inequitable conduct necessary to justify the equitable subordination of their claims against the Debtor.

312.    MSSH-NY engaged in inequitable conduct.  Upon information and belief, MSSH-NY's inequitable conduct includes (1) advancing the amounts related to the MSSH-NY Mortgage without expecting payment in return; (2) abusing its position as an insider to force CMC to enter into the MSSH-NY Mortgage to the detriment of CMC's other creditors at a time when MSSH-NY knew that the amounts related to the MSSH-NY Mortgage were unlikely ever to be repaid; (3) breaching its fiduciary duty/duty of loyalty to CMC by using its insider status to force CMC to secure the amounts underlying the MSSH-NY Mortgage; and (4) breaching its fiduciary duty to CMC's creditors by using its insider status to (a) gain an advantage over other unsecured creditors, (b) secure its unsecured claims and (c) favor its own interests and payment above those to other creditors of CMC, at a time when CMC was unable to pay its debts as they matured and was insolvent or in the zone of insolvency, and CMC's had already received going-concern qualifications from its independent auditors reflecting substantial doubts about CMC's ability to continue operations.

313.    MSSH-NY kept CMC artificially afloat so that MSSH-NY could improve its position prior to CMC's inevitable demise.  This prolongation of the insolvent or near-

insolvent Debtor's existence damaged its creditors by inducing them to provide goods and services for which they did not get repaid.

314.    Upon information and belief, the Defendants also desired to acquire the protections of debt and to avoid the uncertainties and burdens of contributing capital.

315.    MSSH-NY knew or should have known that, without the infusion of sufficient capital, CMC would be unable to meet its obligations to trade creditors and other unsecured creditors as they became due.

316.    In taking the aforementioned actions, the Defendants:

(a)    had full opportunity to determine the then existing financial condition of CMC; and

(b)    had the full opportunity to determine what CMC's ability would be to pay its obligations as they came due in the ordinary course of business, including obligations owed to general unsecured creditors.

317.    The general unsecured creditors, on the other hand:

(a)    did not have access to the financial information concerning CMC that was available to the Defendants, who were insiders of CMC;

(b)    did not have the same opportunity as the Defendants to assess what CMC's ability would be to pay its obligations in the ordinary course of its business after each transaction and action; and

(c)    did not know about the inequitable conduct of MSSH-NY.

318.    Accordingly, MSSH-NY took unfair advantage of CMC and its unsecured creditors by virtue of their insider position and control over CMC.

319. This inequitable conduct resulted in substantial value to MSSH-NY in the form of the MSSH-NY Mortgage and the related liens.

320. By reason of the foregoing, CMC's general unsecured creditors were harmed.

321. Allowing MSSH-NY, an insider of CMC, to receive payment on its claims associated with the MSSH-NY Mortgage or to maintain its related liens thereto prior to the unsecured creditors receiving payment, would be unfair and inequitable.

322. Equitable subordination of MSSH-NY's claims associated with MSSH-NY Mortgage and the transfer of the liens related thereto to the estate is consistent with the Bankruptcy Code.

323. Accordingly, MSSH-NY's claims associated with the MSSH-NY Mortgage should be equitably subordinated to the claims of all general unsecured creditors and the related liens thereto transferred to the estate pursuant to § 510(c) of the Bankruptcy Code.

## EIGHTEENTH CAUSE OF ACTION
### (Fraudulent Conveyance of the MSSH-ILL Mortgage)

324. The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 323 as if fully set forth herein.

325. The execution and delivery of the MSSH-ILL Mortgage is a conveyance as that term is defined New York Debtor and Creditor Law § 270.

326. Upon information and belief, CMC was either insolvent at the time of the MSSH-ILL Mortgage or rendered insolvent thereby within the meaning of New York Debtor and Creditor Law § 271.

327.     Upon information and belief, CMC did not receive fair consideration in exchange for the MSSH-ILL Mortgage within the meaning of New York Debtor and Creditor Law § 272.

328.     Upon information and belief, the MSSH-ILL Mortgage was not entered into or received in good faith within the meaning of New York Debtor and Creditor Law § 272.

329.     Upon information and belief, when the MSSH-ILL Mortgage was entered into CMC did not receive fair consideration in exchange for the MSSH-ILL Mortgage and was insolvent at the time or was thereby rendered insolvent within the meaning of New York Debtor and Creditor Law § 273.

330.     Accordingly, the Committee is entitled to judgment pursuant to New York Debtor and Creditor Law § 278 setting aside the MSSH-ILL Mortgage or awarding the Committee damages in a sum to be determined at trial, plus interest.

### NINETEENTH CAUSE OF ACTION
**(Fraudulent Conveyance of the MSSH-ILL Mortgage)**

331.     The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 330 as if fully set forth herein.

332.     The execution and delivery of the MSSH-ILL Mortgage is a conveyance as that term is defined New York Debtor and Creditor Law § 270.

333.     Upon information and belief, CMC held unreasonably small capital at all relevant times when the MSSH-ILL Mortgage was entered into within the meaning of New York Debtor and Creditor Law § 274.

334. Upon information and belief, CMC did not receive fair consideration in exchange for the MSSH-ILL Mortgage within the meaning of New York Debtor and Creditor Law § 272.

335. Upon information and belief, the MSSH-ILL Mortgage was not entered into or received in good faith within the meaning of New York Debtor and Creditor Law § 272.

336. Upon information and belief, when the MSSH-ILL Mortgage was entered into CMC did not receive fair consideration in exchange for the MSSH-ILL Mortgage and held unreasonably small capital within the meaning of New York Debtor and Creditor Law § 274.

337. Accordingly, the Committee is entitled to judgment pursuant to New York Debtor and Creditor Law § 278 setting aside the MSSH-ILL Mortgage or awarding the Committee damages in a sum to be determined at trial, plus interest.

### TWENTIETH CAUSE OF ACTION
**(Fraudulent Conveyance of the MSSH-ILL Mortgage)**

338. The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 337 as if fully set forth herein.

339. The execution and delivery of the MSSH-ILL Mortgage is a conveyance as that term is defined New York Debtor and Creditor Law § 270.

340. Upon information and belief, CMC had incurred, or was intending to incur, debts beyond CMC's ability to pay as such debts mature at all relevant times when the MSSH-ILL Mortgage was entered into within the meaning of New York Debtor and Creditor Law § 275.

- 62 -

341.     Upon information and belief, CMC did not receive fair consideration in exchange for the MSSH-ILL Mortgage within the meaning of New York Debtor and Creditor Law § 272.

342.     Upon information and belief, the MSSH-ILL Mortgage was not entered into or received in good faith within the meaning of New York Debtor and Creditor Law § 272.

343.     Upon information and belief, when the MSSH-ILL Mortgage was entered into CMC did not receive fair consideration in exchange for the MSSH-ILL Mortgage and CMC had incurred, or was intending to incur, debts beyond CMC's ability to pay as such debts mature within the meaning of New York Debtor and Creditor Law § 275.

344.     Accordingly, the Committee is entitled to judgment pursuant to New York Debtor and Creditor Law § 278 setting aside the MSSH-ILL Mortgage or awarding the Committee damages in a sum to be determined at trial, plus interest.

## TWENTY-FIRST CAUSE OF ACTION
### (Fraudulent Conveyance of the MSSH-ILL Mortgage)

345.     The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 344 as if fully set forth herein.

346.     The execution and delivery of the MSSH-ILL Mortgage is a conveyance as that term is defined New York Debtor and Creditor Law § 270.

347.     Upon information and belief, the MSSH-ILL Mortgage was entered into with the actual intent to hinder, delay or defraud creditors of the bankruptcy estate within the meaning of New York Debtor and Creditor Law § 276.

- 63 -

348.    Accordingly, the Committee is entitled to judgment pursuant to New York Debtor and Creditor Law § 278 setting aside the MSSH-ILL Mortgage or awarding the Committee damages in a sum to be determined at trial, plus interest and attorney's fees.

## TWENTY-SECOND CAUSE OF ACTION
### (Fraudulent Conveyance of the MSSH-NY Mortgage)

349.    The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 348 as if fully set forth herein.

350.    The execution and delivery of the MSSH-NY Mortgage is a conveyance as that term is defined New York Debtor and Creditor Law § 270.

351.    Upon information and belief, CMC was either insolvent at the time of the MSSH-ILL Mortgage or rendered insolvent thereby within the meaning of New York Debtor and Creditor Law § 271.

352.    Upon information and belief, CMC did not receive fair consideration in exchange for the MSSH-NY Mortgage within the meaning of New York Debtor and Creditor Law § 272.

353.    Upon information and belief, the MSSH-NY Mortgage was not entered into or received in good faith within the meaning of New York Debtor and Creditor Law § 272.

354.    Upon information and belief, when the MSSH-NY Mortgage was entered into CMC did not receive fair consideration in exchange for the MSSH-NY Mortgage and was insolvent at the time within the meaning of New York Debtor and Creditor Law § 273.

LEGAL02/31581513v3

355. Accordingly, the Committee is entitled to judgment pursuant to New York Debtor and Creditor Law § 278 setting aside the MSSH-NY Mortgage or awarding the Committee damages in a sum to be determined at trial, plus interest.

## TWENTY-THIRD CAUSE OF ACTION
### (Fraudulent Conveyance of the MSSH-NY Mortgage)

356. The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 355 as if fully set forth herein.

357. The execution and delivery of the MSSH-NY Mortgage is a conveyance as that term is defined New York Debtor and Creditor Law § 270.

358. Upon information and belief, CMC held unreasonably small capital at all relevant times when the MSSH-NY Mortgage was entered into within the meaning of New York Debtor and Creditor Law § 274.

359. Upon information and belief, CMC did not receive fair consideration in exchange for the MSSH-NY Mortgage within the meaning of New York Debtor and Creditor Law § 272.

360. Upon information and belief, the MSSH-NY Mortgage was not entered into or received in good faith within the meaning of New York Debtor and Creditor Law § 272.

361. Upon information and belief, when the MSSH-NY Mortgage was entered into CMC did not receive fair consideration in exchange for the MSSH-NY Mortgage and held unreasonably small capital within the meaning of New York Debtor and Creditor Law § 274.

LEGAL02/31581513v3

362.    Accordingly, the Committee is entitled to judgment pursuant to New York Debtor and Creditor Law § 278 setting aside the MSSH-NY Mortgage or awarding the Committee damages in a sum to be determined at trial, plus interest.

### TWENTY-FOURTH CAUSE OF ACTION
**(Fraudulent Conveyance of the MSSH-NY Mortgage)**

363.    The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 362 as if fully set forth herein.

364.    The execution and delivery of the MSSH-NY Mortgage is a conveyance as that term is defined New York Debtor and Creditor Law § 270.

365.    Upon information and belief, CMC had incurred, or was intending to incur, debts beyond CMC's ability to pay as such debts mature at all relevant times when the MSSH-NY Mortgage was entered into within the meaning of New York Debtor and Creditor Law § 275.

366.    Upon information and belief, CMC did not receive fair consideration in exchange for the MSSH-NY Mortgage within the meaning of New York Debtor and Creditor Law § 272.

367.    Upon information and belief, the MSSH-NY Mortgage was not entered into or received in good faith within the meaning of New York Debtor and Creditor Law § 272.

368.    Upon information and belief, when the MSSH-NY Mortgage was entered into CMC did not receive fair consideration in exchange for the MSSH-NY Mortgage and CMC had incurred, or was intending to incur, debts beyond CMC's ability to pay as such debts mature within the meaning of New York Debtor and Creditor Law § 275.

369.    Accordingly, the Committee is entitled to judgment pursuant to New York Debtor and Creditor Law § 278 setting aside the MSSH-NY Mortgage or awarding the Committee damages in a sum to be determined at trial, plus interest.

### TWENTY-FIFTH CAUSE OF ACTION
#### (Fraudulent Conveyance of the MSSH-NY Mortgage)

370.    The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 369 as if fully set forth herein.

371.    The execution and delivery of the MSSH-NY Mortgage is a conveyance as that term is defined New York Debtor and Creditor Law § 270.

372.    Upon information and belief, the MSSH-NY Mortgage was entered into with the actual intent to hinder, delay or defraud creditors of the bankruptcy estate within the meaning of New York Debtor and Creditor Law § 276.

373.    Accordingly, the Committee is entitled to judgment pursuant to New York Debtor and Creditor Law § 278 setting aside the MSSH-NY Mortgage or awarding the Committee damages in a sum to be determined at trial, plus interest and attorney's fees.

### TWENTY-SIXTH CAUSE OF ACTION
#### (Avoidance of Preferential Transfers Pursuant to
#### Section 547 of the Bankruptcy Code)

374.    The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 373 as if fully set forth herein.

375.    Each of the Avoidable Transfers constitutes a transfer of an interest of CMC in property.

376.    The Avoidable Transfers were made to or for the benefit of the Defendants, a creditor of CMC.

377.    On information and belief, each of the Avoidable Transfers was made for,

or on account of, an antecedent debt(s) owed by CMC to the Defendants. before each of the Avoidable Transfers was made.

378.     On information and belief, CMC was insolvent at the time of the Avoidable Transfers.

379.     The Avoidable Transfers enabled the Defendants to receive a greater benefit than it would have received if (a) the case were a case under chapter 7 of the Bankruptcy Code, (b) the Avoidable Transfers had not been made, and (c) the Defendants received payment of the antecedent debt(s) owed by CMC to the extent provided by the Bankruptcy Code.

380.     On information and belief, the Avoidable Transfers were made during the one year prior to the Petition Date.

381.     That the Defendants were insiders of CMC when the Avoidable Transfers were made.

382.     By reason of the foregoing, the Avoidable Transfers are avoidable pursuant to Section 547(b) of the Bankruptcy Code.

## TWENTY-SEVENTH CAUSE OF ACTION
### (Avoidance of Fraudulent Transfers Pursuant to Section 548 of the Bankruptcy Code)

383.     The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 382 as if fully set forth herein.

384.     On information and belief, the Avoidable Transfers were made within one year of the Petition Date.

385.     To the extent one or more of the Avoidable Transfers were not on account of an antecedent debt, CMC did not receive reasonably equivalent value in exchange for

such transfer(s) (the "<u>Fraudulent Transfers</u>").

386. On information and belief,

a. CMC was insolvent on the date any Fraudulent Transfers were made, or became insolvent as a result of the Fraudulent Transfers;

b. CMC was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with CMC was an unreasonably small capital; or

c. CMC intended to incur, or believed that CMC would incur, debt that would be beyond CMC's ability to pay as such debts matured.

387. By reason of the foregoing, the Fraudulent Transfers are avoidable pursuant to Section 548(a) of the Bankruptcy Code.

## TWENTY-EIGHTH CAUSE OF ACTION
### (Recovery of Avoided Transfers Pursuant to Section 550(a) of the Bankruptcy Code)

388. The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 387 as if fully set forth herein.

389. The Defendants were the initial transferee of the Avoidable Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Avoidable Transfers were made.

390. By reason of the foregoing, to the extent the Avoidable Transfers are avoided pursuant to Section 547 and 548 of the Bankruptcy Code, under Section 550(a) of the Bankruptcy Code, the Committee is entitled to recover from the Defendants, for the benefit of CMC's estate, the full value of the Avoidable Transfers.

## TWENTY-NINTH CAUSE OF ACTION
### (Disallowance of Claims Pursuant to
### Section 502(d) of the Bankruptcy Code)

391. The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 390 as if fully set forth herein.

392. The Avoidable Transfers are recoverable from the Defendants pursuant to Section 550 of the Bankruptcy Code.

393. The Defendants were the initial transferee of the Avoidable Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Avoidable Transfers were made, and the Avoidable Transfers are avoidable pursuant to Sections 547 and 548 of the Bankruptcy Code.

394. Pursuant to Section 502(d) of the Bankruptcy Code, any claims of the Defendants against CMC must be disallowed until such time as the Defendants pay to CMC an amount equal to the aggregate amount of all the Avoidable Transfers.

395. As such, the Unsecured Scheduled Claims and any proofs of claim that may be filed by the Defendants must be disallowed until such time as Defendant pays to CMC an amount equal to the aggregate amount of all the Avoidable Transfers.

## THIRTIETH CAUSE OF ACTION
### (Declaring Certain "Debts" Barred By the Statute of Limitations)

396. The Committee repeats and realleges the allegations set forth in the preceding paragraphs numbered 1 through 395 as if fully set forth herein.

397. The following are all barred by the six-year statute of limitations for a debt collection claim under New York Law: (i) the 1983 Substituted Note, Series Two, (ii) the 1994 Substituted Note, (iii) the 1984 Stuyvesant Mortgage Note and (iii) the Assigned Stuyvesant Claim.

398.     As such, the Committee requests that this Court declare the debt underlying (i) the 1983 Substituted Note, Series Two, (ii) the 1994 Substituted Note, (iii) the 1984 Stuyvesant Mortgage Note and (iii) the Assigned Stuyvesant Claim unenforceable as against CMC.

### Reservation of Rights and Claims

399.     The allegations contained in Paragraphs 1 through 398 are incorporated herein by reference.

400.     The causes of action set forth in this Complaint are based upon the information provided to date by CMC and Defendants in response to the Committee's informal discovery requests.

401.     As discovery proceeds, the Committee may become aware of additional causes of action not set forth in this Complaint. The Committee expressly reserves any and all rights to amend this Complaint to add additional claims, or to bring additional claims in the future, based on newly discovered information not available as of the filing of this Complaint.

### PRAYER FOR RELIEF

**WHEREFORE**, the Committee respectfully requests that the Court grant the following relief:

(i)     On the First Cause of Action, recharacterizing as capital contributions or grants amounts provided to CMC by MSSH-ILL in relation to the 1983 Substituted Note, Series Two;

(ii)     On the Second Cause of Action, recharacterizing as capital contributions or grants amounts provided by MSSH-ILL in relation to the 1994 Substituted Note;

(iii)    On the Third Cause of Action, recharacterizing as capital contributions or grants amounts provided to CMC by MSSH-ILL in relation to the 1984 Stuyvesant Mortgage Note;

(iv)    On the Fourth Cause of Action, recharacterizing as capital contributions or grants amounts related to the Assigned Stuyvesant Claim and Secured Demand Note;

(v)    On the Fifth Cause of Action, recharacterizing as capital contributions or grants amounts provided to CMC by MSSH-NY in relation to the 2004 Promissory Note and the underlying transactions;

(vi)    On the Sixth Cause of Action, recharacterizing as capital contributions or grants amounts provided to CMC by MSSH-NY in relation to the MSSH-NY Unsecured Claims;

(vii)    On the Seventh Cause of Action, canceling the indebetedness relating to the MSSH-ILL Mortgage, MSSH-NY Mortgage and related liens thereto to the extent the Court determines that the debt evidenced by (1) the 1983 Substituted Note, Series One, (2) the 1994 Substituted Note, (3) the 1984 Stuyvesant Mortgage Note, (4) the Assigned Stuyvesant Claim, (5) the Allied Irish Bank Guarantee or (6) the 2004 Promissory Note should be recharacterized as capital contributions or grants;

(viii)    On the Eighth Cause of Action, declaring the MSSH-ILL Unsecured Scheduled Claim and the Allied Irish Bank Guarantee claim purported to be secured by the MSSH-ILL Mortgage to be duplicative, and not allowing recovery thereto;

(ix)    On the Ninth Cause of Action, declaring the Allied Irish Loan Guarantee a claim against CDC and not CMC, and denying such claim as against CMC;

(x)     On the Tenth Cause of Action, equitably subordinating all MSSH-ILL's claims associated with the 1983 Substituted Note, Series Two to the claims of all general unsecured creditors of CMC pursuant to Section 510(c) of the Bankruptcy Code;

(xi)     On the Eleventh Cause of Action, equitably subordinating all MSSH-ILL's claims associated with the 1994 Substituted Note to the claims of all general unsecured creditors of CMC pursuant to Section 510(c) of the Bankruptcy Code;

(xii)     On the Twelfth Cause of Action, equitably subordinating all MSSH-ILL's claims associated with the 1984 Stuyvesant Mortgage Note to the claims of all general unsecured creditors of CMC pursuant to Section 510(c) of the Bankruptcy Code;

(xiii)     On the Thirteenth Cause of Action, equitably subordinating all MSSH-ILL's claims associated with the Assigned Stuyvesant Claim to the claims of all general unsecured creditors of CMC pursuant to Section 510(c) of the Bankruptcy Code;

(xiv)     On the Fourteenth Cause of Action, equitably subordinating all MSSH-ILL's claims associated with the Allied Irish Bank Guarantee to the claims of all general unsecured creditors of CMC pursuant to Section 510(c) of the Bankruptcy Code;

(xv)     On the Fifteenth Cause of Action, equitably subordinating all MSSH-NY's claims associated with the 2004 Promissory Note to the claims of all general unsecured creditors of CMC pursuant to Section 510(c) of the Bankruptcy Code;

(xvi)     On the Sixteenth Cause of Action, equitably subordinating all MSSH-ILL's claims associated with the MSSH-ILL Mortgage and the related liens thereto to the claims of all general unsecured creditors of CMC pursuant to Section 510(c) of the Bankruptcy Code;

LEGAL02/31581513v3

(xvii)  On the Seventieth Cause of Action, equitably subordinating all MSSH-NY's claims associated with the MSSH-NY Mortgage and the related liens thereto to the claims of all general unsecured creditors of CMC pursuant to Section 510(c) of the Bankruptcy Code;

(xviii) On the Eighteenth Cause of Action, granting the Committee a judgment pursuant to New York Debtor and Creditor Law § 278 setting aside the MSSH-ILL Mortgage or awarding the Committee damages in a sum to be determined at trial plus interest;

(xix)  On the Ninetieth Cause of Action, granting the Committee a judgment pursuant to New York Debtor and Creditor Law § 278 setting aside the MSSH-ILL Mortgage or awarding the Committee damages in a sum to be determined at trial plus interest;

(xx)  On the Twentieth Cause of Action, granting the Committee a judgment pursuant to New York Debtor and Creditor Law § 278 setting aside the MSSH-ILL Mortgage or awarding the Committee damages in a sum to be determined at trial plus interest;

(xxi)  On the Twenty-First Cause of Action, granting the Committee a judgment pursuant to New York Debtor and Creditor Law § 278 setting aside the MSSH-ILL Mortgage or awarding the Committee damages in a sum to be determined at trial plus interest and attorney's fees;

(xxii) On the Twenty-Second Cause of Action, granting the Committee a judgment pursuant to New York Debtor and Creditor Law § 278 setting aside the MSSH-

NY Mortgage or awarding the Committee damages in a sum to be determined at trial plus interest;

(xxiii) On the Twenty-Third Cause of Action, granting the Committee a judgment pursuant to New York Debtor and Creditor Law § 278 setting aside the MSSH-NY Mortgage or awarding the Committee damages in a sum to be determined at trial plus interest;

(xxiv) On the Twenty-Fourth Cause of Action, granting the Committee a judgment pursuant to New York Debtor and Creditor Law § 278 setting aside the MSSH-NY Mortgage or awarding the Committee damages in a sum to be determined at trial plus interest;

(xxv) On the Twenty-Fifth Cause of Action, granting the Committee a judgment pursuant to New York Debtor and Creditor Law § 278 setting aside the MSSH-NY Mortgage or awarding the Committee damages in a sum to be determined at trial plus interest and attorney's fees;

(xxvi) On the Twenty-Sixth Cause of Action, avoiding the Avoidable Transfers pursuant to Section 547(b) of the Bankruptcy Code;

(xxvii) On the Twenty-Seventh Cause of Action, avoiding the Avoidable Transfers pursuant to Section 548(a) of the Bankruptcy Code;

(xxviii) On the Twenty-Eighth Cause of Action, awarding the Committee a judgment against the Defendants in an amount equal to the aggregate value of the Avoidable Transfers and directing the Defendants to immediately return the amount awarded to the Debtor's estate;

LEGAL02/31581513v3

(xxix) On the Twenty-Ninth Cause of Action, providing that any and all claims against the Debtor scheduled or filed in the above-captioned chapter 11 case pending before this Court by, or on behalf of the Defendants shall be disallowed in their entirety if the Defendants fail or refuse to return to the Debtor's estate the amount awarded;

(xxx) On the Thirtieth Cause of Action, declaring (i) the 1983 Substituted Note, Series Two, (ii) the 1994 Substituted Note, (iii) the 1984 Stuyvesant Mortgage Note and (iii) the Assigned Stuyvesant Claim unenforceable against CMC; and

(xxxi) Awarding such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       October 28, 2009

Respectfully submitted,

ALSTON & BIRD LLP

__/s/ Martin G. Bunin_____
Martin G. Bunin
Craig E. Freeman
Catherine R. Fenoglio
90 Park Avenue
New York, NY 10016-1387
Telephone: (212) 210-9400

*Attorneys for Plaintiff*
*Official Committee of Unsecured*
*Creditors of Cabrini Medical Center*